ERNEST C. ROSE, Plaintiff-Appellee, *v.* RONALD OBA, in his capacity as acting administrator of Hilo Hospital; HILO HOSPITAL; ABELINA MADRID SHAW, in her capacity as Deputy Director of Health, County/State Hospitals, State of Hawaii; and DEPARTMENT OF HEALTH, Defendants-Appellants

NO. 10668

(CIVIL NO. 85-111)

APRIL 22, 1986

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, AND WAKATSUKI, JJ.

## OPINION OF THE COURT BY HAYASHI, J.

The appellee, Ernest C. Rose, M.D. (hereinafter "Dr. Rose"), brought an action challenging the termination of his privileges at Hilo Hospital. The trial court dismissed the decision of the Governing Authority[1] to revoke Dr. Rose's privileges, on the ground that the rules and regulations pursuant to which his privileges were revoked were not promulgated in accordance with the rule-making procedures in the Hawaii Administrative Procedure Act (hereinafter "HAPA"), as enacted in Hawaii Revised Statutes (hereinafter "HRS") Chapter 91. For the reasons set forth herein, we reverse.

### I.

In 1983, Dr. Rose obtained associate staff membership at Hilo Hospital, a public hospital, with privileges in anesthesiology. On May 10, 1984, Dr. Rose's clinical privileges were summarily suspended. The charges against him included improper disposition in the operating room, substandard performance of anesthesia, improper handling of narcotics, and fraudulent patient billings. On June 12, 1984, after a hearing requested by Dr. Rose, the Executive Committee of Hilo Hospital found a lack of clear and convincing evidence justifying continued suspension, but appointed a four-person panel to review Dr. Rose's activities.

---

[1]The Governing Authority for the public hospitals and medical facilities in the Department of Health, County/State Hospitals Division, is the Director of Health or his designated representative.

On August 13, 1984, appellant Abelina Madrid Shaw (hereinafter "Shaw"), Deputy Director of the Department of Health, notified Dr. Rose that the Governing Authority planned to direct the administrator of the hospital to cancel his medical privileges. Dr. Rose was charged, in general, with having his practice of anesthesia fall below the standard of care required of anesthesiologists and having misappropriated and used narcotics at the hospital.

After a hearing at which both Dr. Rose and the Governing Authority were represented by counsel, a Special Ad Hoc Peer Review Committee concluded Dr. Rose's privileges at Hilo Hospital should be revoked immediately. The Committee found Dr. Rose had given inadequate attention to patients under anesthesia, substandardly performed spinal and epidural anesthesia, left erroneously marked anesthetics on the anesthesia table, and misappropriated narcotics and administered them to himself.

By letter dated December 17, 1984, Shaw notified appellant Ronald Oba, Acting Administrator of Hilo Hospital, that the Governing Authority had adopted the decision of the Special Ad Hoc Peer Review Committee and revoked Dr. Rose's privileges. A copy of this letter and the decision of the Committee was sent to Dr. Rose.

II.

Dr. Rose contends his privileges to practice medicine at Hilo Hospital were revoked pursuant to invalid procedures. The lower court agreed, setting aside the decision of the Governing Authority on the ground "that the State Department of Health failed to follow Chapter 91, Hawaii Administrative Procedure[] Act, in promulgating the rules and regulations at Hilo Hospital," namely the Hilo Hospital Medical Staff Constitution and By-Laws, Rules and Regulations, and Policies and Procedures (hereinafter "Hilo Hospital Bylaws"). Record, Vol. 2 at 172.[2] We hold that the provisions of the Hilo Hospital Bylaws providing

---

[2]The trial court record reflects some confusion as to which rules and regulations are at issue in this case. The Governing Body Bylaws, which govern the operation and maintenance of public hospitals and related health and medical facilities, are not at issue. According to representations made to the trial court by counsel for appellants, the Governing Body Bylaws were in fact promulgated in accordance with the rule-making procedures in HAPA.

for corrective action against doctors with clinical privileges at the hospital are not "rules" within the meaning of HAPA and therefore did not need to be adopted pursuant to the rule-making procedures of HAPA.[3]

A state agency must conform to the requirements of HAPA when acting in a rule-making capacity. *See Town v. Land Use Commission,* 55 Haw. 538, 545, 524 P.2d 84, 89, *reh'g denied,* 55 Haw. 677 (1974). HAPA requires that all rules, among other things, be made available for public inspection, HRS § 91-2(a)(3) (1976), be adopted only after following certain procedures aimed at giving the public notice of the proposed rules and an opportunity to participate in their adoption, HRS § 91-3(a) (Supp. 1984), and be submitted for the approval of the governor and formally filed with the lieutenant governor, HRS § 91-4(a) (1976). Rules not promulgated in accordance with the HAPA rule-making requirements are invalid and unenforceable. *Burk v. Sunn,* 68 Haw. ___, ___, 705 P.2d 17, 20-21 (1985).

Appellants admit the relevant procedures governing corrective action were not adopted in accordance with the HAPA rule-making requirements, but contend compliance was not necessary because the procedures are not "rules" within the meaning of HRS § 91-1(4). HRS § 91-1(4) (1976) defines the term "rule" as follows:

(4) "Rule" means each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency. The term does not include regulations concerning only the internal management of an agency and not affecting private rights of or procedures available to the

---

[3]We entertain no doubt that Dr. Rose was afforded adequate due process. Recognizing the principle that a hospital must afford procedural due process when granting or denying staff privileges, in *Silver v. Castle Memorial Hospital,* 53 Haw. 475, 497 P.2d 564, *cert. denied,* 409 U.S. 1048 (1972), we set forth certain procedural safeguards. Those safeguards have been met in this case. The record shows Dr. Rose was provided with an evidentiary hearing before a Special Ad Hoc Peer Review Committee. He was given notice sufficiently prior to the hearing to prepare an adequate defense, and was apprised in writing of the specific charges against him. Furthermore, Dr. Rose was given the opportunity to submit written evidence prior to and at the hearing, to call and examine witnesses, to cross-examine witnesses who testified against him, and to be represented by an attorney at the hearing. At oral argument before this court, counsel for Dr. Rose conceded that Dr. Rose had received "some" due process.

public, nor does the term include declaratory rulings issued pursuant to section 91-8, nor intra-agency memoranda.

Specifically exempted, therefore, are regulations concerning only the internal management of an agency and not affecting private rights of or procedures available to the public. The provisions of the Hilo Hospital Bylaws governing corrective action against a doctor concern only the internal management and operation of Hilo Hospital. As stated in Hse. Stand. Comm. Rep. No. 8, in 1961 House Journal, at 656 (emphasis added):

> It is intended by this definition of "rule" that regulations and policy prescribed and used by an agency *principally directed to its staff* and its operations are excluded from the definition. In this connection your Committee considers matters relating to the operation and management of state and county penal, correctional, welfare, educational, *public health and mental health institutions,* operation of the National Guard, the custodial management of the property of the state or county or of any agency primarily a matter of "internal management" as used in this definition.

In *Waugh v. University of Hawaii,* 63 Haw. 117, 621 P.2d 957 (1980), we relied upon the above provision in determining that the relationship between a university and its faculty fell within the internal management exception. In *Waugh,* a faculty member claimed the university should be required to promulgate rules of practice to handle claims by faculty for lost or damaged research materials. We held that such rules would not be "rules" under HAPA because they "would affect only the staff and faculty of the University and not the 'private rights of or procedures available to the public.'" *Id.* at 131, 621 P.2d at 968.[4]

---

[4]We have also held the internal management exception to apply to matters relating to the security of a prison and investigations of welfare fraud. *See Holdman v. Olim,* 59 Haw. 346, 581 P.2d 1164 (1978) (rules of Oahu State Prison regarding the type of apparel which could be worn by prison visitors); *Doe v. Chang,* 58 Haw. 94, 564 P.2d 1271 (1977) (agency manual prescribing manner for investigation by DSSH personnel of welfare fraud cases). Although the state welfare fraud procedures in *Doe v. Chang* indirectly affected members of the public who were welfare recipients, we reasoned as follows:

> The only persons purporting to be instructed or ordered thereby are the personnel of the department. The manual does not define the circumstances under which welfare recipients, or others not members of the department personnel, shall be granted or denied benefits. It does not command the public to do anything, prohibit the public

Moreover, the provisions for corrective action in the Hilo Hospital Bylaws do not affect private rights of or procedures available to the public. At best, they only indirectly affect the private rights of the public to the extent the public has an interest in the qualifications of doctors practicing in public hospitals, and to the extent a patient's choice of hospitals is reduced when his doctor's privileges at a particular hospital are revoked. In contrast, we determined that the regulations in *Aguiar v. Hawaii Housing Authority,* 55 Haw. 478, 522 P.2d 1255 (1974), which set forth maximum income limits for continued occupancy by tenants in public housing and which established a schedule of rents which tenants must pay for that housing, were "rules" within the meaning of HRS § 91-1(4) because they had a direct effect on the private rights of tenants living in public housing and members of the public who were interested in becoming tenants. *Id.* at 489, 522 P.2d at 1263. Similarly, we determined that the rule in *Burk v. Sunn,* 68 Haw. ___, 705 P.2d 17 (1985), which prorated food stamp benefits received in the initial month of qualification over a 30-day standard month instead of the exact number of days in the month, had a "direct impact" on the rights of recipients and was therefore a "rule" under HAPA. *Id.* at ___, 705 P.2d at 27.

A stated objective of the rule-making provisions of HAPA is "[t]o provide for public participation in the rule-making process, by allowing any interested person to petition for a change in the rules as well as to participate in a public hearing." Hse. Stand. Comm. Rep. No. 8, in 1961 House Journal, at 655. However, the degree to which the Hilo Hospital Bylaws' provisions for corrective action affect the public's rights is not sufficient to require the public's input in their promulgation.

The conclusion that the corrective action provisions of the Hilo Hospital Bylaws need not be promulgated under HAPA is not inconsistent with HRS § 321-10 (1976), which provides:

§ *321-10   Rules, adoption, effect.*   All rules and regulations made by the department of health shall be made in conformity with chapter 91. They shall have the force and effect of law.

---

from doing anything or declare the rights of the public in any respect. It does not make any procedures available to the public. We find it difficult to hypothesize a stronger example of the internal regulation contemplated by HRS § 91-1(4).
58 Haw. at 96, 564 P.2d at 1273.

Reading HRS § 321-10 together with HRS. Chapter 91[5] leads to the conclusion that only those "rules and regulations made by the department of health," HRS § 321-10, which qualify as "rules" within the meaning of HAPA will be subject to the rule-making requirements of HAPA.

We reverse the order and judgment granting Dr. Rose's motion to dismiss the decision of the Governing Authority and denying appellants' motion to dismiss the complaint for declaratory relief brought by Dr. Rose, and remand for further proceedings consistent with this opinion.

*Gary N. Hagerman* (*Lyons, Hagerman & Brandt* of counsel) for Defendants-Appellants.

*Pamela J. Berman,* for Plaintiff-Appellee.

---

[5]"Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other." HRS § 1-16 (1976).