**Electronically Filed
Intermediate Court of Appeals
CAAP-14-0001313
18-DEC-2015
09:23 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---


GREEN PARTY OF HAWAII, KAREN M. HOLT, ELIZABETH M. RUZE,
MICHAEL KRATZKE, MOANI KEALA AKAKA, KIM DUFFETT,
MARY JO DENNISON and MAKA'ALA KA'AUMOANA, Plaintiffs-Appellants,
v. SCOTT NAGO, Chief Elections Office, State of Hawai'i,
and STATE OF HAWAI'I, Defendants-Appellees


NO. CAAP-14-0001313


APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CIVIL NO. 12-1-0956(2))


DECEMBER 18, 2015


FOLEY, PRESIDING JUDGE, LEONARD and REIFURTH, JJ.


OPINION OF THE COURT BY LEONARD, J.

Following the 2012 General Election, Plaintiffs-Appellants Green Party of Hawaii, Karen M. Holt, Elizabeth M. Ruze, Michael Kratzke, Moani Keala Akaka, Kim Duffet, Mary Jo Dennison, and Maka'ala Ka'aumoana (collectively, **Appellants**) filed suit against Defendants Scott Nago, Chief Election Officer (**Nago**) and the State of Hawai'i (**State**) (together, **Appellees**), alleging that: three of the methodologies and procedures used by the State in conjunction with the 2012 General Election were "rules" within the meaning of Hawaii Revised Statutes (**HRS**) Chapter 91;

these purported rules were not promulgated in compliance with HRS Chapter 91; and therefore, they should be declared invalid and subject to a permanent injunction. The Circuit Court of the Second Circuit (**Circuit Court**)[1] rejected Appellants' arguments and entered Judgment in favor of Nago and the State.

Appellants appeal from the Circuit Court's October 24, 2014 Final Judgment and challenge the Circuit Court's September 26, 2014 "Findings of Fact, Conclusions of Law and Order: (1) Granting Defendants Scott Nago, Chief Election Officer, and the State of Hawaii's Motion for Summary Judgment; and (2) Denying Plaintiffs' Motion for Summary Judgment" (**FOF/COL and Order**). We affirm.

## I. BACKGROUND

This case arose out of the 2012 General Election. It is undisputed that mistakes were made. There was a shortage of paper ballots in English at a number of precincts across the State. In addition, when reserve ballots were sent out to the polling places, there was a mix up of the ballots sent to two locations; this resulted in 57 voters casting votes on incorrect ballots. It appears, however, that: all voters in line at the close of voting received the opportunity to vote; if English language paper ballots were not immediately available at a particular polling place, voters could vote at an electronic voting machine or on an alternative language paper ballot; every voter who signed a precinct book cast a ballot; every voter who voted on the wrong paper ballot had his or her vote counted in every race in which he or she was entitled to vote; and, none of the races that could have been impacted by the ballot mix-up were close enough to have been affected. Nevertheless, as widely acknowledged, Appellees' execution of the 2012 General Election fell short of the electorate's reasonable expectations.

Appellants filed a Complaint on December 7, 2012, alleging that Appellees engaged in unlawful rule-making. Appellants demanded declaratory and injunctive relief as follows:

---

[1] The Honorable Peter T. Cahill presided.

(1) the use of the methodology used to determine the number of ballots to be printed in a federal and/or state election, (2) the procedures by which a precinct requests additional paper or marksense ballots when the precinct runs out of ballots and receives additional blank paper or marksense ballots, and (3) the procedure used to rectify the situation when a voter votes a ballot that contains some races to which the voter is not entitled to vote, to be invalid [rules], temporary, preliminary and/or permanent injunctive relief prohibiting [Appellees] from acting pursuant to such invalid rules, and an award of reasonable attorney's fees and costs.

Appellants filed "Plaintiffs' Motion for Summary Judgment" on May 30, 2014. Appellees filed "Defendants Scott Nago and State of Hawaii's Motion for Summary Judgment" (**Appellees' MSJ**) on June 9, 2014. The hearing on both motions was held on July 18, 2014. The Circuit Court entered its FOF/COL and Order on September 26, 2014.

Concerning the methodology used to determine the number of blank ballots printed for the 2012 General Election, the Circuit Court's undisputed findings include:

Ballot Delivery

6. The Chief Election officer is required to deliver a sufficient number of ballots to each of the precincts before the polls open on Election Day. Haw. Rev. Stat. §§ 11-119, 11-120; Haw. Admin. R. §§ 3-172-72, 3-172-73, 3-172-74.

7. Prior to the 2012 General Election, the model for ordering polling place ballots was based on calculating 85% of the amount of registered voters in the precinct. In other words, if there were 100 registered voters in a precinct, 85 ballots would be assigned to the polling place for Election Day voters.

8. Voter turnout in comparable elections can be used as a basis to increase or decrease the ballot order as necessary (i.e. depending on previous elections 85% can be increased to 90% or reduced to 80%). This is more difficult to do in an election following a reapportionment. Thus, in 2012, a direct correlation in the number of ballots needed for the current precincts and the precincts that existed for the 2010 General Election and the 2008 General Election (which was the last presidential election) could not be made because the recently completed reapportionment/redistricting process changed the district boundaries.

9. Polling place voter turnout has historically ranged from 22.6% to 40.6% of registered voters, depending on the year and whether it was a primary election, general election, presidential election, or gubernatorial election and as a result, this calculation (85% of registered voters in a precinct) resulted in essentially twice as many ballots ordered as polling place voters.

10. Percentages are based on the summary report for elections from 2008 to 2010, under the heading "precinct turnout" which refers to the percentage of registered voters who voted at the polls. The low was 22.6% for the 2008 Primary Election and the high was that same year in the 2008 General Election at 40.6%. The 2010 Primary Election was 23.8% and the General Election was 32.2%.

11. In the past, the absentee mail ballots ordered were generally equal to 35% of the polling place ballots, absentee walk ballots ordered were 20% of the polling place ballots and reserve ballots were equal to 6% of the polling place ballot order, (i.e., Amount of Polling Place Ballots = Registered Voter Count x 85%; Amount of Absentee Mail Ballots = Amount of Polling Place Ballots x 35%; Amount of Absentee Walk Ballots = Amount of Polling Place Ballots x 20%; and Amount of Reserve Ballots = Amount of Polling Place Ballots x 6%).

12. Absentee walk ballots are ballots that are cast by voters who vote prior to Election Day at a polling place outside of their precinct that is set up for early voting.

13. Generally, the end result is a ballot order of 137 ballots for every 100 registered voters or, in other words, a ballot order of 137% of the voter registration count for a precinct.

14. In addition, the ballot order calculation can be supplemented by a review of the absentee ballot utilization to determine whether reserve ballots should be deployed with the polling place ballots prior to the opening of polls.

. . . .

20. Additional ballots may also be printed by the vendor on Election Day.

. . . .

Ballot Delivery for the 2012 General Election

22. The 2012 General Election was the first General Election following the reapportionment and redistricting of the precincts in 2011.

23. As a result of reapportionment and redistricting, precinct/district boundaries changed and there was no prior General Election to use as a starting point in calculating the number of ballots needed in each of the post-reapportionment and redistricting precincts.

24. Accordingly, for the 2012 General Election, the Office of Elections modified the ballot order calculation by utilizing the 2012 Primary Election voter turnout as the base and multiplied the numbers by 125%. Due to concerns regarding the adequacy of 6% reserve ballots, that percentage was increased to 25%.

25. The 2012 General Election ballot order for the polling places was 32.4% of the registered voters; absentee mail ballots were calculated at 29.1%; absentee walk was 5.8%; and the number of reserve ballots was increased to 25.1%.

26. During the 2012 General Election, certain polling places experienced a shortage of paper ballots in English.

27. While certain polling places experienced a shortage of paper ballots in English during the 2012 General Election, voters who went to those polling places, could vote on a minority language ballot or by using an electronic voting machine.

28. During the 2012 General Election, no voter[] who was in line at a polling place prior to 6:00 p.m. and was eligible to vote, was turned away and not allowed to vote.

Concerning the procedures used by the precincts to determine to request additional ballots on election day, the Circuit Court's undisputed findings include:

40. On Election Day, precinct workers monitor the supply of paper ballots at the polling place and when it appears that the supply of ballots is running low, a precinct worker calls the counting center at the State Capitol and asks that reserve ballots for that precinct be delivered.

Concerning the procedures used to rectify the situation when a voter casts a ballot that contains some races in which the voter is not entitled to vote, the Circuit Court's undisputed findings include:

<u>Counting Votes on Wrong Ballots</u>

42. The vote counting equipment at each of the polling places is electronically programmed to read only the paper ballots for races for which voters who reside in that precinct are entitled to vote.

43. The precinct counters at each of the polling places will reject paper ballots that include election contests that do not pertain to that precinct and will reject those ballots.

44. All rejected ballots are deposited into a sealed emergency ballot bin and are delivered to the counting center where the votes on those ballots are manually counted after the polls close.

45. In counting the votes cast on a wrong ballot, all of the votes cast in races for which the voters in that precinct are entitled to vote are counted and all of the votes cast in races for which voters in that precinct are not entitled to vote are not counted.

46. Where voters have mistakenly voted on the wrong ballot or some other irregularity in the election has occurred, any candidate, any qualified, directly interested political party, or any 30 voters of an election district may file an election contest in the [Hawai'i Supreme Court under HRS § 11-172 (2009 Repl.)].

Based on these and other FOFs, the Circuit Court concluded, *inter alia*, that "the challenged procedures and methodologies are regulations concerning only the internal management of an agency," there was no evidence that the challenged procedures and methodologies "affected the private rights of, and procedures available to, the public," and Nago and the State were entitled to summary judgment on Appellants' claims of illegal rule-making. The Circuit Court entered the Final Judgment on October 24, 2014.

## II. POINTS OF ERROR

On appeal, Appellants contend that the Circuit Court erred in:

(1) concluding that the methodology used to determine the number of blank ballots to be printed for an election was not a rule within the meaning of HRS § 91-1(4) (2012) and therefore was not required to be adopted pursuant to HRS § 91-3 (2012);

(2) concluding that the procedures used by a precinct to request additional ballots when the precinct runs out of ballots and receives additional ballots were not rules within the meaning of HRS § 91-1(4) and therefore were not required to be adopted pursuant to HRS § 91-3;

(3) concluding that the procedures used to rectify the situation when a voter casts a ballot that contains some races in which the voter is not entitled to vote were not rules within the meaning of HRS § 91-1(4) and therefore were not required to be adopted pursuant to HRS § 91-3; and

(4) considering Appellants' decision to not file a petition pursuant to HRS § 91-6 (2012) to be a factor in determining the validity of rules or their promulgation in a claim brought under HRS § 91-7 (2012).

## III. STANDARDS OF REVIEW

"The interpretation of a statute is a question of law reviewable de novo." Ka Pa'akai O Ka'Aina v. Land Use Comm'n, 94 Hawai'i 31, 41, 7 P.3d 1068, 1078 (2000) (citations and internal

6

quotation marks omitted) (quoting <u>Amantiad v. Odum</u>, 90 Hawai'i 152, 160, 977 P.2d 160, 168-69 (1999).

"A COL is not binding upon an appellate court and is freely reviewable for its correctness. [The appellate] court ordinarily reviews COLs under the right/wrong standard." <u>Chun v. Bd. of Trs. of Employees' Ret. Sys.</u>, 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005) (citations and internal quotation marks omitted) (quoting <u>Allstate Ins. Co. v. Ponce</u>, 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004)).

> On appeal, the grant or denial of summary judgment is reviewed *de novo*. <u>See</u> <u>State ex rel. Anzai v. City and Cnty. of Honolulu</u>, 99 Hawai'i 508, [515], 57 P.3d 433, [440] (2002); <u>Bitney v. Honolulu Police Dep't</u>, 96 Hawai'i 243, 250, 30 P.3d 257, 264 (2001).

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and inferences drawn therefrom in the light most favorable to the party opposing the motion.

> <u>Kahale v. City and Cnty. of Honolulu</u>, 104 Hawai'i 341, 344, 90 P.3d 233, 236 (2004) (citation omitted).

<u>Nuuanu Valley Ass'n v. City & Cnty. of Honolulu</u>, 119 Hawai'i 90, 96, 194 P.3d 531, 537 (2008).

## IV. DISCUSSION

### A. Election Methodologies and Procedures

Appellants argue that the Circuit Court erroneously concluded that the challenged election methodologies and procedures were not "rules" within the meaning of the Hawai'i Administrative Procedure Act (**HAPA**), *i.e.*, HRS chapter 91.

"A state agency must conform to the requirements of HAPA when acting in a rule-making capacity." <u>Rose v. Oba</u>, 68 Haw. 422, 425, 717 P.2d 1029, 1031 (1986). "Rules not promulgated in accordance with the HAPA rule-making requirements

are invalid and unenforceable." Id. (citing Burk v. Sunn, 68 Haw. 80, 83, 705 P.2d 17, 20-21 (1985)). "Rule" is broadly defined by HRS § 91-1(4) as meaning:

> each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency. The term does not include regulations concerning only the internal management of an agency and not affecting private rights of or procedures available to the public, nor does the term include declaratory rulings issued pursuant to [§] 91-8, nor intra-agency memoranda.

A number of Hawaiʻi appellate court decisions have examined what constitutes a HAPA rule. Some cases have focused primarily on the first part of HRS § 91-1(4), i.e., whether the agency has made a "statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency." Others have focused additionally or primarily on the second part of HRS § 91-1(4), i.e., the "internal management" exception. Although none of these cases involved agency actions quite like the ones at issue in this case, these cases inform our decision here.

In Aguiar v. Haw. Hous. Auth., 55 Haw. 478, 479-81, 522 P.2d 1255, 1257-58 (1974), the supreme court considered whether the Hawaii Housing Authority's (**HHA's**) written policies setting maximum income limits for continued tenancy in public housing and rent schedules, which were set forth in amendments to HHA's "Master Management Resolution," were rules within the meaning of HAPA, subject to HAPA's rule-making requirements. HHA argued that the income limits and rents were not "'agency statement(s) of general or particular applicability and future effect.'" Id. at 485, 522 P.2d at 1260. First noting that HHA did not seriously challenge the "future effect" of the policies, the supreme court stated "it is clear that agency statements of 'general' applicability include those which delineate the future rights of the entire class of unnamed individuals with the agency's jurisdiction" and concluded that the "generality of

8

effect" requirement was satisfied. Id. at 485-86, 522 P.2d at 1261 (citations omitted).[2] The supreme court likewise rejected HHA's contention that the Master Management Resolution did not "'implement, interpret, or prescribe law or policy' within the meaning of HRS § 91-1(4)" because, although HHA had limited discretion due to federal mandates, HHA retained the important function of assessing parts of the rent formulation, which "obviously affect[ed]" the rights of low-income tenants. Id. at 486-87, 522 P.2d at 1261. Accordingly, the supreme court held that amendments to the Master Management Resolution "constitute 'agency statement(s) . . . that implement law or policy" within the meaning of HRS § 91-1(4), are subject to the rule-making obligations of HAPA, and, ultimately, could not be applied to increase rents. Id. at 486-88, 493, 522 P.2d at 1261-62, 1265.[3]

In Shoreline Transp., Inc. v. Robert's Tours & Transp., Inc., 70 Haw. 585, 779 P.2d 868 (1989), the supreme court was principally called upon to distinguish between the rule-making and adjudicatory functions of administrative agencies. In doing so, the supreme court emphasized that "[r]ulemaking is the process by which an agency lays down new prescriptions to govern the future conduct of those subject to its authority [and] . . . is essentially legislative in nature, not only because it operates in the future, but also because it is concerned largely with considerations of policy." Id. at 591, 779 P.2d at 872 (citations and internal quotation marks omitted). The supreme court again examined this distinction, and the characteristics of

---

[2] In a footnote, the supreme court explained that, notwithstanding HAPA's inclusion of the words "or particular," a "key characteristic of rule making as distinguished from adjudication is the former's generality of effect." Aguiar, 55 Haw. at 485 n.13, 522 P.2d at 1261 n.13.

[3] The supreme court also dispatched HHA's argument that the "internal management" exception applied, noting that the exception only applied if the regulation concerns internal management and does not affect "private rights of the public" and observing that the "amendments 'affected' in both a practical and a legal sense the 'private rights'" of current tenants and prospective tenants of the low-income housing. Aguiar, 55 Haw. at 488-90, 522 P.2d at 1262-63.

rule-making in <u>In re Hawaiian Elec., Inc.</u>, 81 Hawai'i 459, 918 P.2d 561 (1996), noting that it is "generally accepted that the distinguishing characteristic of rule-making is the generality of effect of the agency decision." <u>Id.</u> at 466, 918 P.2d at 568 (citations omitted). The supreme court again emphasized that "[r]ule-making is an agency action governing the future conduct either of groups of persons or of a single individual; it is essentially legislative in nature, not only because it operates in the future, but also because it is concerned largely with considerations of policy." <u>Id.</u> Although the following observation was made in reference to adjudicatory matters, it appears relevant to other functions within an administrative agency's purview:

> [P]roblems may arise in a case which the administrative agency could not reasonably foresee, problems which must be resolved despite the absence of a general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain the power to deal with the problems on a case-by-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards.

<u>Id.</u> at 468, 918 P.2d at 570 (quoting <u>Security and Exch. Comm'n v. Chenery Corp.</u>, 332 U.S. 194, 202-03 (1947)).

In <u>Hawaii Prince Hotel Waikiki Corp. v. City & Cnty. of Honolulu [(**City**)]</u>, 89 Hawai'i 381, 974 P.2d 21 (1999), the supreme court was called upon to decide whether the unwritten methodology adopted by the City's appraiser to determine "imparted value" of golf courses was a rule within the meaning of HAPA. The City appraiser explained that he had "standards 'in his head'" which he used because, after several adverse rulings by the tax appeals court, he had stopped using the City's written guidelines. <u>Id.</u> at 391, 974 P.2d at 31. In addition to determining that the methodology was arbitrary and resulted in a lack of uniformity and inequality (<u>id.</u> at 392, 972 P.2d at 32), the supreme court concluded that "the City appraiser's

methodology . . . was clearly a 'rule' within the meaning of HRS
§ 91-1(4)" because the methodology was "based on his
interpretation of the factors" in the applicable law and because
of the future effect of the methodology on the assessments of all
golf course owners. Id. at 393, 974 P.2d at 33. Accordingly,
the supreme court ordered the City to "promulgate a rule defining
a methodology for ascertaining imparted value and to reassess the
subject property accordingly." Id.

In Nūuanu Valley Ass'n, the supreme court concluded
that the City Department of Planning and Permitting's (**DPP's**)
undocumented "practice" of publicly disclosing engineering
reports only after they had been deemed acceptable constituted
improper rule-making because the practice, in effect, amended the
rule requiring disclosure and "affects the procedures available
to the public and implements, interprets, or prescribes policy or
describes the procedure or practice requirements of DPP." Nuuanu
Valley Ass'n, 119 Hawai'i at 99-100, 194 P.3d at 540-41 (citing
HRS § 91-1(4); format altered).

More recently, both the Intermediate Court of Appeals
(**ICA**) and the supreme court rejected the argument that the State
Board of Land and Natural Resources's (**BLNR's**) methodology for
determining the valuation of damages to natural resources
constituted a "rule" within the meaning of HRS § 91-1(4). See
Pila'a 400, LLC v. Bd. of Land & Natural Resources, 132 Hawai'i
247, 320 P.3d 912 (2014). The supreme court noted that HRS
§ 183C-3 authorized, but did not require, the BLNR and the
Department of Land and Natural Resources (**DLNR**) to adopt rules
and establish and enforce land use regulations. Id. at 264, 320
P.3d at 929. The supreme court emphasized that the statute
contained only a "general mandate" for rule-making, which was
complied with through the promulgation of Hawaii Administrative
Rules (**HAR**) chapter 13-5, and that there was no specific
statutory requirement mandating rules for valuing damage to
marine resources. Id. at 265, 320 P.3d at 930. Further, the
supreme court opined that the circumstances were not appropriate

for rule-making, quoting, *inter alia*, the language from <u>Chenery</u> and <u>In re Hawaiian Elec.</u>, discussed herein above. <u>Id.</u> at 265-66, 320 P.2d at 930-31. The court revisited the nature of rule-making, noting "[i]n the most general terms, the purpose of rule-making is to govern the future conduct of groups and individuals" and concluding that "[s]etting a general standard in this situation would be impractical to define by a general rule because [it] was an 'unforeseen situation' and 'so specialized and varying in nature so as to be impossible of capture within the boundaries of a general rule.'" <u>Id.</u> at 266, 320 P.3d at 931 (citations omitted). Quoting the ICA, the supreme court concluded that the agency's task was "a complex undertaking involving <u>numerous and variable components</u>, often unique to a particular situation [<u>rendering</u>] a single formulaic methodology <u>. . . impracticable</u>." <u>Id.</u>

The supreme court in <u>Pilaʻa 400</u> also distinguished the circumstances of that case from the City appraiser's unwritten methodology in <u>Hawaii Prince</u>, explaining that the City appraiser "routinely calculated imparted value" and thus "the appraiser's future use of the imparted value methodology was clearly foreseeable" whereas the natural resource damage was unique. <u>Id.</u> at 266-67, 320 P.3d at 931-32.

In other cases, the Hawaiʻi appellate courts have implicitly or explicitly assumed that the first part of the HRS § 91-1(4) definitional requirements has been satisfied and turned directly to the "internal management" exception. In one such case, <u>Doe v. Chang</u>, 58 Haw. 94, 564 P.2d 1271 (1977), the supreme court considered whether a manual of instruction to Department of Social Service and Housing (**DSSH**) personnel concerning welfare fraud investigations was a rule. Although not discussed, the subject manual clearly included written statements of future effect that implemented or interpreted law or policy. <u>Id.</u> Applying the second part of HRS § 91-1(4), the supreme court noted that "the adoption by DSSH of rules having the force and effect of law, to govern investigations, is not mandated by HRS

§ 346-14(9) if the operating requirements of the department are satisfied by <u>regulations concerning only its internal management and not affecting private rights of or procedures available to the public</u>." <u>Id.</u> at 96, 564 P.2d at 1273 (emphasis added). The supreme court then held:

> The manual of instructions in issue here falls into the described class of regulations. The only persons purporting to be instructed or ordered thereby are the personnel of the department. The manual does not define the circumstances under which welfare recipients, or others not members of the department personnel, shall be granted or denied benefits. It does not command the public to do anything, prohibit the public from doing anything or declare the rights of the public in any respect. It does not make any procedures available to the public. We find it difficult to hypothesize a stronger example of the internal regulation contemplated by HRS § 91-1(4).

<u>Id.</u>

In <u>Holdman v. Olim</u>, 59 Haw. 346, 581 P.2d 1164 (1978), the supreme court "assume[d], without deciding, that the directive under which [the] appellant was denied entry to the prison so mandated standards of dress and limited the discretion of the prison staff as to conform to the inclusive definition of a 'rule'." <u>Id.</u> at 355, 581 P.2d at 1170. Turning to the second part of HRS § 91-1(4), the court observed, "[w]hat constitutes matters of internal management is not clearly spelled out in HAPA itself or its legislative history." <u>Id.</u> As referenced in <u>Holdman</u>, the legislative history indicates:

> [The House Standing Committee] consider[ed] matters relating to the operation and management of state and county penal, correctional, welfare, educational, public health and mental health institutions, operation of the National Guard, the custodial management of the property of the state or county or of any agency primarily a matter of "internal management" as used in this definition.

H. Stand. Comm. Rep. No. 8, in 1961 House Journal, at 656. Accordingly, the supreme court held, "[r]egulation of the access of individuals to a public facility under the custody of an agency, at least where imposed for the security of the facility . . . concerns the internal management of the agency." <u>Holdman</u>, 59 Haw. at 355, 581 P.2d at 1170. Similarly, in <u>Emma Ah Ho v. Cobb</u>, 62 Haw. 546, 617 P.2d 1208 (1980), the supreme court

13

held that a contract between a private entity and BLNR was not a "rule" because it "concerns only the internal management of the Board and does not affect the private rights of or procedures available to the public. . . . The Agreement only sets forth the contractual rights and obligations of [the private party] and the Board." Id. at 551-52, 617 P.2d at 1212.[4]

Another series of "internal management" cases involved guidelines targeted at the conduct of police officers. State v. Fedak, 9 Haw. App. 98, 825 P.2d 1068 (1992), involved a regulation by the Honolulu Police Department (**HPD**) establishing sobriety roadblock procedures. The ICA held that the regulation was an internal HPD regulation based in part on Massachusetts case law noting that such guidelines "are directed solely toward troopers" and "do not purport directly to regulate public conduct." Fedak, 9 Haw. App. at 100-01, 825 P.2d at 1070 (citations omitted). This court concluded that, "although HPD sobriety roadblocks unquestionably impinge on a driver's freedom of movement, [the regulation's] procedures are aimed at prescribing and controlling the police officer's activities in order to minimize the intrusion on the driver's rights." Id. at 101, 825 P.2d at 1070. Similarly, in In Interest of Doe, 9 Haw. App. 406, 412, 844 P.2d 679, 682-83 (1992), this court held:

> [T]he field sobriety testing procedures established by the [Hawaii County Police Department(**HCPD**)] were instructional in nature directed only to the HCPD officers. The procedures instructed the officers how to administer field sobriety tests to drivers reasonably believed to have been [driving under the influence], after they were properly stopped and ordered out of their cars. Also, although field sobriety tests intrude on drivers' rights as do sobriety roadblocks, HCPD's field sobriety testing procedures are aimed at assuring the proper and correct methods of administering the tests to drivers.

---

[4] The supreme court also referenced the reasoning found in federal Administrative Procedure Act contract cases, including that "the government must be free from vexatious restraints which interfere with the manner in which it may dispatch its own internal affairs," "the practical necessity" of the exception, and the unreasonableness, burden and expense that would be associated with requiring rule-making procedures for every government contract. Ho, 62 Haw. at 552-53, 617 P.2d at 1213 (citations omitted).

>            Consequently, those testing procedures concern
>       only the "internal management" of the HCPD and do not
>       affect the "private rights of or procedures available
>       to the public" within the meaning of HAPA.

In State v. Claunch, 111 Hawai'i 59, 137 P.3d 373 (App. 2006), while taking into consideration the Legislature's response to Fedak,[5] this court held that the Kauai Police Department's regulations establishing authority and procedures at sobriety checkpoints, like the regulations in Fedak, only concerned the internal management of the agency and did not affect the private rights of or procedures available to the public. Claunch, 111 Hawai'i at 66, 137 P.3d at 380.[6]

With that foundation, we turn to Appellants' allegations of illegal rule-making.

## 1. Blank Ballots Printing

Appellants argue that the methodology used to determine the number of blank ballots to be printed for an election constituted a "rule" within the meaning of HRS § 91-1(4) and seek, *inter alia*, a declaration invalidating the use of the methodology used to determine the number of ballots to be ordered for the 2012 General Election. The challenged methodology is set forth in the Circuit Court's FOFs, in particular FOFs 23-25. In short, an employee in the Office of Elections ordered the 2012 General Election ballots by using the 2012 Primary Election voter turnout as the base and multiplying that number by 125%, plus

---

[5] In addition to holding that the HPD guidelines establishing sobriety road block procedures were not "rules" withing the meaning of HRS §91-1(4), Fedak held that, in that case, the State had not proven that the police officer had authority to change the location of the road block and, therefore, the defendant's seizure was illegal. Fedak, 9 Haw. App. at 103-04, 825 P.2d at 1071-72.

[6] Guidelines and regulations targeted toward personnel have been consistently deemed not "rules" within the meaning of § HRS 91-1(4). See, e.g., Rose, 68 Haw. at 427, 717 P.2d at 1032 (finding that the bylaws of a hospital governing corrective action against a doctor concern only the internal management and operation of the hospital and do not affect the private rights of or procedures available to the public); Waugh v. Univ. of Haw., 63 Haw. 117, 131 621 P.2d 957, 968 (1980) (holding that the plaintiff's suggested procedures would affect only the staff and faculty of the university and not the private rights of or procedures available to the public); Doe v. Chang, 58 Haw. at 96, 564 P.2d at 1273 (discussed above).

ordered an additional 25% in reserve ballots. As explained in FOFs 7-20, this methodology differed from prior elections, at least in part due to an intervening reapportionment/redistricting process. Appellants have colorfully described this unwritten methodology as a "middle-level political appointee deciding the methodology for the number of blank ballots to be ordered in a room by herself." The State more specifically described this methodology in its answers to interrogatories, which Appellants submitted in support of their motion for summary judgment, including the following excerpts:

> Former Office of Elections' Ballot Operations Section Head, Lori Tomczyk, determined the formula to use to calculate the number of ballots printed in the primary and general elections (ballot order) of 2012. Based upon her experience in preparing the ballot orders in prior elections, Ms. Tomczyk modified prior ballot methodologies. The calculations were subject to further refinement up to and including Election Day, depending upon external circumstances, including, among other things, the number of absentee ballots and feedback from the county clerks.

> The State is unaware of any specific document involved in the determination process of the ballot ordering process for the 2012 primary and general elections.

> . . . .

> For the ballot order for the 2012 Primary Election, the former Ballot Operations Section Head multiplied the precinct registered voter count by 80%, on the assumption (based on past primary elections) that 80% of the registered voters would actually vote in the election, or that such an amount would provide an adequate buffer over historical voter turnouts. As voters can vote by absentee mail, absentee walk, and at the polling place on Election Day, Ms. Tomczyk predicted how many of these populations would vote in each setting. Ms. Tomczyk assumed that 45% of the expected voters would vote at the polling places, 30% by absentee mail, and the remaining 25% would vote by absentee walk.

> According to the actual ballot order for the 2012 Primary Election, ballots for the polling place were calculated as 37.3% of the registered voters (Amount of Polling Place Ballots = Registered Voter Count x 80% x 45%); absentee mail ballots were calculated at 30% (Amount of Absentee Mail Ballots = Registered Voter Count x 80% x 30%); absentee walk ballots were calculated at 20.6% of registered voters (Amount of Absentee Walk Ballots = Registered Voter Count x 80% x 25%) and reserve ballots were calculated at 4.6% of registered voters (Amount of Reserve Ballots = Registered Voter Count x 80% x 6%).

16

> For the 2012 General Election, the Office of Elections modified the ballot order formula by utilizing the 2012 Primary Election voter turnout as the base and multiplied the numbers by 125%. Due to concerns regarding the adequacy of 6% as reserve ballots, that percentage was increased to 25%.
>
> Thus, the 2012 General Election ballot order for the polling places was 32.4% of the registered voters; absentee mail ballots were calculated at 29.1%; absentee walk was 5.8%; and the number of reserve ballots, was increased to 25.1%.
>
> . . . .
>
> Additional ballots may also be printed by the vendor on Election Day.

It further appears that 2012 was the first and only time this methodology was employed; Ms. Tomczyk utilized a different formula for the primary and general elections of 2008 and 2010, a formula that was based on a methodology reflected in a document entitled Ballot Order 2002.

We begin with the first part of HRS § 91-1(4), *i.e.*, whether the agency has made a "statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency." Clearly, this methodology implements Hawai'i election law, in particular HRS § 11-119(d) (2009), which requires delivery of "a sufficient number of ballots."[7]

We must also determine, however, whether the agency made a statement of general applicability and future effect. There was no written methodology, but as evidenced by the supreme court's rulings in <u>Hawaii Prince</u> and <u>Nuuanu Valley Ass'n</u>, under some circumstances, an unwritten practice or policy can be a statement which constitutes a Chapter 91 rule. In <u>Hawaii Prince</u>,

---

[7]  HRS § 11-119(d) provides:

>     (d)  Each precinct shall receive a sufficient number of ballots based on the number of registered voters and the expected spoilage in the election concerned. A sufficient number of absentee ballots shall be delivered to each clerk not later than 4:30 p.m. on the fifteenth day prior to the date of any election.

the calculation of "imparted value" was based on the City appraiser's interpretation of a factor enumerated in the applicable law, *i.e.* "the effect of the value of the golf course on the surrounding lands,"[8] and the City appraiser's interpretation of this factor was of general applicability and future effect as it was applied to all golf course owners. Hawaii Prince Hotel Waikiki Corp., 89 Hawai'i at 386, 393, 974 P.2d at 26, 33. In Nuuanu Valley Ass'n, the practice of not disclosing preliminary engineering reports had both general applicability and future effect because it negated the rule requiring disclosure and it implemented, interpreted, or prescribed DPP's disclosure policies and practices. Nuuanu Valley Ass'n, 119 Hawai'i at 99-100, 194 P.3d at 540-41. Here, while it appears that, as provided in HRS § 11-119(d), Appellees' employee took into consideration the number of registered voters in the methodology she used to determine the number of ballots to be ordered, the number of registered voters was merely a data point. There was no policy statement or interpretation of the statute; instead, there was a one-time calculation/miscalculation of what would be a sufficient number of blank ballots in the first instance, which was exacerbated by general election day errors in the delivery of reserve ballots. Importantly, it is clear from the record that the methodology used to determine the number of ballots was ad hoc, intended only for the 2012 elections, due to the reapportionment/redistricting process and that it involved unacceptably poor execution of an important government function. There is nothing in the record to indicate that this methodology was ever intended to or would ever be used again in the future. Thus, we conclude that the methodology used in 2012 to determine the number of blank ballots to be printed was not a "statement of general or particular applicability and future effect that implements, interprets, or prescribes law or

---

[8] This factor is stated in the Revised Ordinances of Honolulu § 8-7.4(a)(2).

policy, or describes the organization, procedure, or practice requirements of any agency." See HRS § 91-1(4).[9]

This conclusion is supported by the supreme court's holdings that "[r]ulemaking is the process by which an agency lays down new prescriptions to govern the future conduct of those subject to its authority [and] . . . is essentially legislative in nature, not only because it operates in the future, but also because it is concerned largely with considerations of policy." Shoreline Transp., 70 Haw. at 591, 779 P.2d at 872 (citations omitted); See also In re Hawaiian Elec., 81 Hawai'i at 466, 918 at 568. Ms. Tomczyk's calculation/methodology was not intended and cannot be construed as a new prescription to govern future conduct of any sort.

In addition, similar to Pila'a 400, the applicable statute here contains only general rule-making authority, not a specific mandate to promulgate rules for determining the number of ballots to be printed.[10] Indeed, HRS § 11-4 is deliberatively permissive and discretionary, stating, in relevant part:

> § 11-4 **Rules and regulations.** The chief election officer <u>may</u> make, amend, and repeal such rules and regulations governing elections held under this title, election procedures, and the selection, establishment, use and operation of all voting systems now in use or to be adopted in the State, and all other similar matters relating thereto <u>as in the chief election officer's judgment shall be necessary to carry out this title</u>.

(Emphasis added.)

We note that Appellants did not petition the Chief Elections Officer for adoption or amendment of a rule, pursuant

---

[9] This conclusion should not be construed as holding that a rule could not be promulgated setting forth a methodology for the determination of the number of blank ballots to be printed.

[10] The Chief Election Officer's general mandate for rule-making, set forth in HRS §§ 11-2(e) & 11-4 (2009), was complied with through the promulgation of HAR chapters 3-171 through 3-176.

to HRS § 91-6,[11] and in fact challenge the Circuit Court's
FOF/COL and Order based in part on the argument that the Circuit
Court improperly considered Appellants' decision to pursue relief
under HRS § 91-7[12] rather than HRS § 91-6.  Thus, we need not
address whether a specific rule for determining the number of
ballots was so "necessary" that Nago's judgment not to proceed
with Chapter 91 rule-making was an abuse of the discretion
granted in HRS § 11-4 or, alternatively, whether a "single
formulaic methodology" is impracticable "[s]etting a general
standard in this situation would be impractical to define by a
general rule because [this] was an 'unforeseen situation' and 'so
specialized and varying in nature so as to be impossible of
capture within the boundaries of a general rule.'"  Pilaʻa 400,
142 Hawaiʻi at 266, 320 P.3d at 931 (citation omitted); see also
In re Hawaiian Elec., 81 Hawaiʻi at 468, 918 P.2d at 570
(discussing that an agency "may not have had sufficient
experience with a particular problem to warrant rigidifying its

---

[11]     HRS § 91-6 provides:

> **§ 91-6  Petition for adoption, amendment or repeal of
> rules.**  Any interested person may petition an agency
> requesting the adoption, amendment, or repeal of any rule
> stating reasons therefor.  Each agency shall adopt rules
> prescribing the form for the petitions and the procedure for
> their submission, consideration, and disposition.  Upon
> submission of the petition, the agency shall within thirty
> days either deny the petition in writing, state its reasons
> for the denial or initiate proceedings in accordance with
> section 91-3.

[12]     HRS § 91-7 provides:

> **§ 91-7  Declaratory judgment on validity of rules.**
> (a) Any interested person may obtain a judicial declaration
> as to the validity of an agency rule as provided in
> subsection (b) herein by bringing an action against the
> agency in the circuit court of the county in which
> petitioner resides or has its principal place of business.
> The action may be maintained whether or not petitioner has
> first requested the agency to pass upon the validity of the
> rule in question.
>
> (b)  The court shall declare the rule invalid if it
> finds that it violates constitutional or statutory
> provisions, or exceeds the statutory authority of the
> agency, or was adopted without compliance with statutory
> rulemaking procedures.

tentative judgment into a hard and fast rule.") (citation omitted).

Finally, as we conclude that the methodology used to determine the number of blank ballots to be printed for the 2012 elections did not constitute an "agency statement of general . . . applicability and future effect" as provided in the first part of HRS § 91-1(4), this methodology was not a rule within the meaning of HRS § 91-1(4). Accordingly, we need not address the exception contained in the second part of HRS § 91-1(4), *i.e.*, whether the methodology concerned only the internal management of the agency and did not affect the private rights of or procedures available to the public.

## 2. Ballot Shortage

Appellants argue that the Circuit Court erroneously concluded that the procedures used by a precinct to request additional ballots when the precinct runs out of ballots and receives additional ballots were not rules within the meaning of HRS § 91-1(4). With respect to this procedure, the Circuit Court found as follows: "On Election Day, precinct workers monitor the supply of paper ballots at the polling place and when it appears that the supply of ballots is running low, a precinct worker calls the counting center at the State Capitol and asks that reserve ballots for that precinct be delivered." Although it is unclear from the Circuit Court's findings and the record on appeal, we will assume without deciding that this procedure is pursuant to established written or verbal instructions from the Chief Elections Officer or his designee to the precinct workers and that the first part of HRS § 91-1(4) is satisfied. See Holdman, 59 Haw. at 355, 581 P.2d at 117.

Turning to the second part of HRS § 91-1(4), the challenged procedure is directed exclusively to precinct workers in the execution of their election day responsibilities. In addition, although the procedure affects in an indirect way the public's interest in having reasonably prompt access to paper ballots on which to cast their vote, it is aimed at prescribing

and controlling election-day workers in order to facilitate the rights of voters, and not at the private rights of or procedures available to the public. See, e.g., Claunch, 111 Hawai'i at 66, 137 P.3d at 380; Rose, 68 Haw. at 427, 717 P.2d at 1032 (holding that, without a direct impact, "the degree to which [the challenged bylaws] . . . affect the public's rights is not sufficient to require the public's input in their promulgation"); Doe v. Chang, 58 Haw. at 96, 564 P.2d at 1273; see also Burdick v. Takushi, 504 U.S. 428, 433 (1992) (explaining, although the right to vote is fundamental, "[i]t does not follow . . . that the right to vote in any manner... is absolute," an that all "[e]lection [regulations] will invariably impose some burden upon individual voters") (citations omitted). Thus, we conclude that the procedures used by a precinct to request additional ballots when the precinct runs out of ballots and receives additional ballots were not rules within the meaning of HRS § 91-1(4).

### 3. Counting Wrong Ballots

Appellants argue that the procedures used to rectify the situation when a voter casts a ballot that contains some races in which the voter is not entitled to vote were rules within the meaning of HRS § 91-1(4). As the Circuit Court found in FOFs 42-46, the vote counting equipment at each precinct is programmed to only accept votes for races in which the precinct voters are eligible to vote. Paper ballots containing votes in other races are rejected by the machines and placed by the voter into sealed emergency ballot bins, which are delivered to the central counting center where all eligible votes are manually counted. Votes casts in races for which voters in a particular precinct are not entitled to vote are not counted. All paper ballot votes entitled to be counted are counted either at the polling place or at the counting center.

This procedure appears consistent with HAR § 3-172-80(g), which requires ballot box officials to deposit voters' paper ballots into the ballot box, HAR § 3-172-83(h), which requires voters to deposit marksense ballots into the ballot box

22

or the precinct counter, HAR § 3-172-86(b), which requires that "voting materials from the polling places shall be transported to the counting center or designated locations in sealed ballot boxes with sealed lid locks and or sealed ballot transport containers by the [delivery and collection] team," and HAR § 3-172-92, which allows the Chief Elections Officer to use centralized counting, decentralized counting, or a combination of both. However, as Appellants state in their opening brief, "[t]he election office has no [specific] rules by which they may dispose of such ballots," i.e., ballots that included races for which voters in a particular precinct were not entitled to vote.

Appellants' statement, which is accurate, undermines their contention that the procedures used to rectify the situation when a voter casts a ballot that contains some races in which the voter is not entitled to vote is a rule. It does not appear that this procedure was a statement of general applicability and future effect directed at implementing, interpreting, or prescribing law, policy, or the procedural requirements of the Office of Elections. See HRS § 91-1(4). Rather it appears that the out-of-precinct ballots were problems that the Chief Elections Officer "could not reasonably foresee, problems which [needed to] be resolved despite the absence of a general rule." In re Hawaiian Elec., 81 Hawaiʻi at 468, 918 P.2d at 570 (citation omitted). Even assuming, arguendo, that this procedure does satisfy the first part of the definition of a rule under HRS § 91-1(4), it appears to fall within the scope of the internal management exception. The procedure is clearly directed only at election workers; it was aimed at ensuring that all votes entitled to be counted were in fact counted and that no votes were counted in violation of HRS § 11-12 (2009);[13] it did not purport to regulate public conduct; and it ensured preservation

---

[13]     HRS § 11-12 provides, in relevant part, that "[n]o person shall register or vote in any other precinct than that in which the person resides[.]"

of-rather than affected-the private rights of and procedures available to the public.

Thus, we conclude that the procedures used to rectify the situation where a voter casts a ballot that contained some races in which the voter was not entitled to vote were not rules within the meaning of HRS § 91-1(4).

**B. Petition for Adoption of Rules Under HRS § 91-6**

Appellants argue the Circuit Court erred "when it determined that the obligation of the agency to promulgate rules pursuant to the procedures laid down in HRS § 91-3 was mitigated or relieved if the interested person invoking the jurisdiction of the courts did not first apply to the agency to engage rule-making under HRS § 91-6." Appellants, however, fail to cite to the record showing that the Circuit Court "determined that the obligation of the agency . . . was mitigated or relieved" by a failure to apply to the agency to engage in rule-making. This court cannot find an instance in which the Circuit Court came to that conclusion. As such, the Circuit Court did not err.

## V. CONCLUSION

In sum, mistakes were made in conjunction with the 2012 General Election. These mistakes may or may not be avoided in the future by adopting new and/or amending current election-related regulations. However, we reject Appellants' arguments that the challenged election methodologies and procedures were rules under HRS § 91-1(4).

For the reasons stated above, the Circuit Court's October 24, 2014 Final Judgment is affirmed.

On the briefs:

Lance D. Collins,
for Plaintiffs-Appellants.

Kimberly Tsumoto Guidry,
First Deputy Solicitor General,
State of Hawai'i,
for Defendants-Appellees.

25