**Electronically Filed
Supreme Court
SCAP-15-0000462
28-JUN-2017
08:17 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

---

DIANE KAWASHIMA, individually and
on behalf of all others similarly situated,
Petitioner/Plaintiff-Appellee/Cross-Appellant,

vs.

STATE OF HAWAIʻI, DEPARTMENT OF EDUCATION;
KATHRYN S. MATAYOSHI, in her official capacity as
Superintendent of Schools; LANCE A. MIZUMOTO, BRIAN J.
DELIMA, PATRICIA BERGIN, GRANT Y.M. CHUN, MAGGIE COX,
HUBERT MINN, KENNETH UEMURA, BRUCE VOSS, JIM WILLIAMS,
ANDREA LYN MATEO, and COLONEL PETER P. SANTA ANA,
in their official capacities as members of the
STATE OF HAWAIʻI BOARD OF EDUCATION,
Respondents/Defendants-Appellants/Cross-Appellees,
(SCAP-15-0000462; CAAP-15-0000462; CIV. NO. 06-1-0244)

---

DAVID GARNER, PATRICIA SMITH, ANDREA CHRISTIE, ALLAN KLITERNICK,
KAREN SOUZA, JO JENNIFER GOLDSMITH, and DAVID HUDSON,
on behalf of themselves and all others similarly situated,
Petitioners/Plaintiffs-Appellees,

vs.

STATE OF HAWAIʻI, DEPARTMENT OF EDUCATION,
Respondents/Defendants-Appellants.
(SCAP-15-0000462; CAAP-15-0000462; CIV. NO. 03-1-000305)

----------------------------------------------------------

ALLAN KLITERNICK, DAVID GARNER, JO JENNIFER GOLDSMITH,
and DAVID HUDSON, individually and on behalf of all others
similarly situated, Petitioners/Plaintiffs-Appellees,

vs.

KATHRYN S. MATAYOSHI, in her official capacity as
Superintendent of Schools, LANCE A. MIZUMOTO, BRIAN J. DELIMA,
PATRICIA BERGIN, GRANT Y.M. CHUN, MAGGIE COX, HUBERT MINN,
KENNETH UEMURA, BRUCE VOSS, JIM WILLIAMS, ANDREA LYN MATEO, and
COLONEL PETER P. SANTA ANA, in their official capacity as members
of the STATE OF HAWAIʻI BOARD OF EDUCATION, DEPARTMENT OF
EDUCATION, STATE OF HAWAIʻI, Respondents/Defendants-Appellants.
(SCAP-15-0000462; CAAP-15-0000462; CIV. NO. 05-1-00031)

SCAP-15-0000462

APPEALS FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT

JUNE 28, 2017

RECKTENWALD, C.J., NAKAYAMA, AND WILSON, JJ.,
CIRCUIT JUDGE CHANG, IN PLACE OF McKENNA, J., RECUSED,
AND CIRCUIT JUDGE CRANDALL, IN PLACE OF POLLACK, J., RECUSED

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.  Introduction

This is a consolidated case involving substitute and part-time temporary teachers who were employed by the State of Hawaiʻi, Department of Education ("State" or "DOE"), and who claim they were underpaid by the State.

Plaintiffs in the Garner case include more than 8,000

substitute teachers (collectively "Garner Plaintiffs" or "substitute teachers") who were paid on a per diem basis. Approximately half of the substitute teachers in Garner also worked in a part-time capacity for which they were paid hourly wages.

During a prior interlocutory appeal in Garner, the Intermediate Court of Appeals (ICA) found that the circuit court properly ruled that the substitute teachers were underpaid and thus entitled to their per diem back wages pursuant to Hawaiʻi Revised Statutes (HRS) § 302A-624(e). See Garner v. State, 122 Hawaiʻi 150, 154-55, 223 P.3d 215, 219-20 (App. 2009) (Garner I). On remand, the circuit court ruled that the Plaintiff class included the substitute teachers who were paid hourly wages and calculated the amount of those wages due, and that Plaintiffs were entitled to interest on their hourly and per diem back wages under HRS § 103-10.

In 2014, the State paid a partial settlement to Garner Plaintiffs in the amount of $14,031,874.70, which settled all per diem wage claims for the claim period from November 8, 2000 through June 30, 2005. The State continued to dispute its liability regarding the payment of the substitute teachers' hourly back wages, and whether the teachers are entitled to interest on their per diem and hourly wages.

3

In 2015, the Circuit Court of the First Circuit (circuit court) entered final judgment in Garner, awarding hourly back wages to Plaintiffs who worked in a part-time capacity in the amount of $6,789,175.21 for the period from November 8, 2000 through June 12, 2012.[1]  The circuit court also awarded interest on both the per diem and hourly back wages owed, in the amount of $13,542,186.74.

Plaintiffs in the Kawashima case include approximately 20,000 part-time temporary teachers (collectively "Kawashima Plaintiffs," "part-time teachers" or "PTTs") who were paid on an hourly basis.  Similar to the substitute teachers claiming hourly back wages in Garner, the PTTs in Kawashima argued that their hourly pay rate, which was set forth in School Code Regulation 5203, was linked to the substitute teachers' per diem pay rate under HRS § 302A-624(e).  Thus, based on the claimed linkage between Regulation 5203 and HRS § 302A-624(e), the PTTs argued that because the substitute teachers were underpaid, they too were underpaid.  The circuit court in Kawashima ruled that the PTTs were underpaid and entitled to hourly back wages in the amount of $24,026,329.52 for the period from February 20, 2004 through June 12, 2012.[2]  In contrast to Garner, however, the

---

[1]     In Garner, the Honorable Karl K. Sakamoto presided.

[2]     In Kawashima, the Honorable Edwin C. Nacino presided.

4

circuit court in Kawashima ruled that the PTTs were not entitled to interest on their unpaid hourly wages under HRS § 103-10. Nevertheless, the circuit court determined that had Plaintiffs been entitled to interest on their hourly back wages under HRS § 103-10, they would have been entitled to interest payments in the amount of $9,450,085.40.

On appeal in Garner, the State argues that the circuit court erred in: (1) determining that Plaintiffs' claims for hourly back wages were "properly part of this case"; (2) determining that School Code Regulation 5203 is an HRS chapter 91 rule; (3) granting summary judgment in favor of the substitute teachers on their hourly back wages contract claim; and (4) determining that the substitute teachers were entitled to interest on their hourly and per diem back wages under HRS § 103-10.

On appeal in Kawashima, the State argues that the circuit court erred in: (1) determining that School Code Regulation 5203 is an HRS chapter 91 rule; and (2) denying the State's motion for summary judgment on the PTTs' hourly back wages contract claim. Kawashima Plaintiffs also cross-appealed the circuit court's rulings, arguing that they are entitled to interest on their unpaid hourly wages under HRS § 103-10.

This court accepted transfer of both Garner and

Kawashima, and subsequently consolidated the cases.

We conclude that Plaintiffs are not entitled to hourly back wages, or interest on any back wages (whether per diem or hourly) under HRS § 103-10.  Because we decide the case on the merits, we do not reach the question of whether the substitute teachers' hourly back wages were properly within the scope of the Garner Plaintiffs' claims.

Therefore, the circuit court's May 19, 2015 judgment in Garner is reversed and remanded for entry of judgment in favor of the State.  Additionally, the circuit court's May 18, 2015 judgment in Kawashima is affirmed in part to the extent that the circuit court determined that Plaintiffs are not entitled to interest under HRS § 103-10, and reversed on all other remaining grounds and remanded for entry of judgment in favor of the State.

## II.  Background

We first provide essential background information regarding the compensation of substitute teachers and PTTs employed by the State.

## A.   Substitute Teachers' Compensation

In 1996, the legislature recodified the education statutes and enacted HRS § 302A-624(e) (Supp. 1997), which established the following per diem rate of pay for substitute teachers:

6

(e) Effective July 1, 1996, the per diem rate for substitute teachers shall be based on the annual entry step salary rate established for a Class II teacher on the most current teachers' salary schedule.  The per diem rate shall be derived from the annual rate in accordance with the following formula:

Per Diem Rate = Annual Salary Rate ÷ 12 months ÷ 21 Average Working Days Per Month.

A "Class II teacher" is defined as "any teacher who holds a certificate issued by the department based upon four acceptable years of college education and other requirements as may be established by the department[.]"[3]  HRS § 302A-618(b)(2) (Supp. 1997).

---

[3]     Subsection (e) remained in effect as enacted until 2005, when the legislature amended it as follows:

(e) Effective July 1, 2005, the minimum hourly or minimum per diem rate for substitute teachers shall be determined by the legislature; provided that the department shall develop a classification and compensation schedule that is not restricted to the minimum compensation rates but may exceed them; provided further that any individual in class I, II or III who works less than a full seven-hour work day shall be compensated on a prorated, hourly basis as follows:

(1) Class I:  other individuals who do not possess a bachelor's degree shall be compensated at a rate of not less than $119.80 for a full work day;

(2) Class II:  individuals with a bachelor's degree shall be compensated at a rate of not less than $130 for a full work day; and

(3) Class III:  department of education teachers, or licensed or highly qualified teachers, shall be compensated at a rate of not less than $140 for a full work day.

HRS § 302A-624(e) (Supp. 2005).
    None of the issues in this appeal concern HRS § 302A-624(e) (Supp. 2005), and all further references to HRS § 302A-624(e) refer to HRS § 302A-624(e) (Supp. 1997).

**B.    Part-Time Teachers' Compensation**

Since at least 1945, the DOE has had a body of internal guidelines called the "School Code."  In 1976, the Board of Education (BOE) adopted School Code Regulation 5203, which linked the hourly wage of PTTs to the per diem wage paid to substitute teachers.  Regulation 5203 provides:

> E.    Part-time Temporary Teachers (Academic and Non-Academic)
>
> EFFECTIVE SEPTEMBER 1, 1976:
>
> Pay rates for Part-time Temporary Teachers (Academic and Non-Academic) employed on an hourly basis shall be based on the most current Per Diem Rates established for Substitute Teachers as follows:
>
> | Class I | Per Diem Rate for Substitute Teacher |
> | Class II | Per Diem Rate for Substitute Teacher |
> | Class III | Per Diem Rate for Substitute Teacher |
>
> Hourly Rates shall be derived from Per Diem Rates in accordance with the following formula:
>
> *Hourly Rate = Per Diem Rate ÷ 6 average working hours per day

The regulation remained unamended until 2005, when the first of a series of changes occurred.  In January 2005, the DOE issued a new version of the Regulation 5203, which stated, "Compensation for Part-time Temporary Teachers on an hourly basis shall be determined by the [DOE]."  In a July 2005 memorandum, Superintendent Patricia Hamamoto adjusted the pay rate of PTTs as follows:

8

> Beginning July 1, 2005, all employees hired as part-time teachers will be assigned to two classes. Compensation will be determined by the academic qualifications of the employee.  The following is a breakdown of the classes:
>
>> • Class A:  Employees with a minimum of a Bachelor's Degree from an accredited institution.
>> Compensation Rate: $22.43 per hour
>>
>> • Class B:  Employees with no Bachelor's Degree. Compensation Rate: $20.67 per hour
>
> Payment for these employees will be retroactive to July 1, 2005.

In 2006, the BOE retroactively ratified the Superintendent's July 2005 memorandum establishing the PTTs' pay rate.  In 2009, the DOE issued "Standard Practice Document SP 5203" (SP 5203), which was intended to supersede Regulation 5203 that was amended January 2005.  SP 5203 stated that compensation for PTTs "shall be determined by the Department."  In 2012, the DOE adopted Hawaiʻi Administrative Rules (HAR) chapter 8-66 (effective June 14, 2012) pursuant to HRS chapter 91's rulemaking procedures, which provided compensation rates for part-time temporary teachers.[4]

---

[4]    HAR § 8-66-7 provides:

Compensation classes.  A part-time temporary teacher shall be assigned to a compensation class based on the academic qualifications of the individual.  The two classes of compensation are:
      (1) Class A for part-time temporary teachers with a minimum of a bachelor's degree from an accredited institution of higher learning; and
      (2) Class B for all part-time temporary teachers not included in Class A.

(continued...)

9

## C.    **Garner** Circuit Court Proceedings

In 2002, Plaintiffs David Garner, Patricia Smith, Andrea Christie, and Allan Kliternick filed a class action complaint in the Circuit Court of the Second Circuit, claiming that the DOE failed to pay the substitute teachers' wages mandated by HRS § 302A-624(e), and seeking back pay for the 2000-2001, 2001-2002, and 2002-2003 school years.[5]

The circuit court certified the Plaintiff class in Garner to include:

> [a]ll persons who have served in position numbers 75100, 75101, 75102, as identified on a DOE SF-5 as a substitute teacher for the Hawaii DOE at public schools of the State of Hawaii from November 8, 2000 through the present.

The class includes approximately 8,000 substitute teachers. Approximately half of the substitute teachers in Garner also worked in a part-time capacity for which they were paid hourly wages, and argue that they are entitled to both their per diem back wages and hourly back wages.

_____

[4](...continued)

HAR § 8-66-8 provides:

Compensation rates. The hourly rate for the classes of part-time temporary teachers are as follows:
(1) Class A:  $22.43 per hour; or
(2) Class B:  $20.67 per hour.

[5]    In 2003, the Garner lawsuit was transferred from the Second Circuit to the First Circuit and assigned to then-Judge (now Justice) Richard W. Pollack. The case was subsequently reassigned to the Honorable Karen Ahn in 2004, and then reassigned to the Honorable Karl K. Sakamoto in 2008.

10

In 2005, Plaintiffs Allan Kliternick, David Garner, Jo Jennifer Goldsmith, and David Hudson filed a similar class action complaint in <u>Kliternick v. Hamamoto</u> (<u>Kliternick</u> case), which covered the 2004-2005 school year.  <u>Garner</u> and <u>Kliternick</u> were consolidated (collectively, the "<u>Garner</u>" case).

In <u>Garner</u>, Plaintiffs raised two claims for relief in their operative complaint, seeking monetary damages and injunctive relief for:  1) violation of HRS § 302A-624(e) (underpaying the substitute teachers); and (2) violation of contract rights (breach of obligation to pay teachers per diem rate under HRS § 302A-624(e)).  The State moved for summary judgment as to all claims and parties, and <u>Garner</u> Plaintiffs moved for partial summary judgment with respect to liability for damages for the period from November 8, 2000 to June 30, 2005. The circuit court granted in part and denied in part <u>Garner</u> Plaintiffs' motion for partial summary judgment, ruling, <u>inter alia</u>, that the State violated its contractual obligation to pay the substitute teachers per diem wages prescribed by HRS § 302A-624(e).  However, the circuit court ruled that the State had sovereign immunity as to prejudgment interest, and thus denied <u>Garner</u> Plaintiffs any prejudgment interest.  The circuit court then authorized an interlocutory appeal from its summary judgment order.

11

The ICA affirmed, inter alia, the circuit court's determination that the DOE violated its obligation to pay the substitute teachers by failing to pay the per diem rate prescribed by HRS § 302A-624(e). Garner I, 122 Hawaiʻi at 154, 223 P.3d at 219. The ICA also ruled that: (1) pursuant to HRS § 661-1,[6] the substitute teachers' claim for breach of contract damages was not barred by sovereign immunity; (2) HRS § 302A-624(e), as a pay mandating statute, provided an alternative basis for invoking jurisdiction under the "founded upon any statute" language in HRS § 661-1; and (3) HRS § 661-8[7] barred any award of

---

[6] HRS § 661-1 (1993) (Jurisdiction) provides:

The several circuit courts of the State and, except as otherwise provided by statute or rule, the several state district courts, subject to appeal as provided by law, shall have original jurisdiction to hear and determine the following matters, and, unless otherwise provided by law, shall determine all questions of fact involved without the intervention of a jury:

(1) All claims against the State founded upon any statute of the State; upon any rule of an executive department; or upon any contract, expressed or implied, with the State, and all claims which may be referred to any such court by the legislature; provided that no action shall be maintained, nor shall any process issue against the State, based on any contract or any act of any state officer that the officer is not authorized to make or do by the laws of the State, nor upon any other cause of action than as herein set forth . . . .

[7] HRS § 661-8 (1993) (Interest) provides:

No interest shall be allowed on any claim up to the time of the rendition of judgment thereon by the court, unless upon a contract expressly stipulating for the payment of interest, or upon a refund of a payment into the "litigated claims fund" as provided by law.

12

prejudgment interest under HRS § 478-2.[8]  Id.  The ICA specifically rejected the State's argument that the substitute teachers had assented to a lower rate of pay than required by HRS §302A-624(e), reasoning that it was part of the parties' agreement that the rate of pay was "subject to applicable State laws," and the parties "could not contract to violate a law determining the rate of pay."[9]  Id. at 170, 223 P.3d at 235 (citations omitted).

On remand, the substitute teachers pursued a different theory regarding their interest claim and moved for an award of interest on their unpaid per diem wages pursuant to HRS § 103-10

---

[8]     HRS § 478-2 (1993) (Legal rate; computation) provides:

When there is no express written contract fixing a different rate of interest, interest shall be allowed at the rate of ten per cent a year, except that, with respect to obligations of the State, interest shall be allowed at the prime rate for each calendar quarter but in no event shall exceed ten per cent a year, as follows:
        (1) For money due on any bond, bill, promissory note, or other instrument of writing, or for money lent, after it becomes due;
        (2) For money due on the settlement of accounts, from the day on which the balance is ascertained;
        (3) For money received to the use of another, from the date of a demand made; and
        (4) For money upon an open account, after sixty days from the date of the last item or transaction.

As used in this section, "prime rate" means the prime rate as posted in the Wall Street Journal on the first business day of the month preceding the calendar quarter.

[9]     Both sides filed applications for writ of certiorari, and both applications were rejected.

(1993).[10]  At a hearing on the motion, the circuit court explained that according to Garner I, the substitute teachers were unquestionably in a contractual relationship with the State, and that HRS § 103-10 was a "pertinent statute incorporated by the contractual relationship."  Thus, the circuit court determined that HRS § 103-10 "constitute[d] a contract expressly stipulating for the payment of interest as required under [HRS §] 661-8," and concluded that Garner Plaintiffs were entitled to

---

[10]      HRS § 103-10 (1993) provides in relevant part:

(a)    Any person who renders a proper statement for goods delivered or services performed, pursuant to contract, to any agency of the State or any county, shall be paid no later than thirty calendar days following receipt of the statement or satisfactory delivery of the goods or performance of the services. In the event circumstances prevent the paying agency from complying with this section, the person shall be entitled to interest from the paying agency on the principal amount remaining unpaid at a rate equal to the prime rate for each calendar quarter plus two per cent, commencing on the thirtieth day following receipt of the statement or satisfactory delivery of the goods or performance of the services, whichever is later, and ending on the date of the check. As used in this subsection, "prime rate" means the prime rate as posted in the Wall Street Journal on the first business day of the month preceding the calendar quarter.

(b)    This section shall not apply in those cases where delay in payment is due to:
    (1)    A bona fide dispute between the State or any county and the contractor concerning the services or goods contracted for;
    (2)    A labor dispute;
    (3)    A power or mechanical failure;
    (4)    Fire;
    (5)    Acts of God; or
    (6)    Any similar circumstances beyond the control of the State or any county.

14

interest on their per diem back pay under HRS § 103-10.[11]

The State moved for a ruling as to the scope of the Garner Plaintiff class, and sought to preclude the Garner class members' recovery for unpaid hourly wages, seeking to limit recovery to only per diem wages. Garner Plaintiffs filed a counter motion, seeking to affirm the scope of the class, or in the alternative to amend the class definition or the complaint. The circuit court granted Garner Plaintiffs' motion and denied the State's motion, ruling that the class members were entitled to recover both per diem and hourly back wages.

Garner Plaintiffs then sought summary judgment for hourly back wages owed and interest thereon under HRS § 103-10. The State filed a counter summary judgment motion. During a hearing on both motions, the circuit court stated that in the "interest of comity," it would follow the circuit court's ruling in the Kawashima case, finding that Regulation 5203 has the same force and effect as law and is subject to HRS chapter 91.[12] The circuit court also determined that HRS § 103-10 was incorporated into the parties' contracts and awarded interest on the

---

[11] The circuit court further stated that the HRS § 478-2 analysis in Garner I did not apply here, and applied only to situations in which there was an absence of an express contract, which was distinguishable from the instant case.

[12] The Kawashima circuit court's ruling is discussed infra, Section II.D.

15

substitute teachers' hourly back wages. The circuit court subsequently filed an order granting <u>Garner</u> Plaintiffs' motion and denying the State's motion, ruling that the substitute teachers who also worked in a part-time capacity were entitled to hourly back wages from November 8, 2000 until June 14, 2012 and interest thereon under HRS § 103-10.

In 2014, the State paid a partial settlement to <u>Garner</u> Plaintiffs in the amount of $14,031,874.70, which settled all per diem wage claims for the claim period from November 8, 2000 through June 30, 2005. The State continued to dispute its liability regarding the payment of hourly back wages.

On May 19, 2015, the circuit court entered final judgment, awarding $6,789,175.21 to the substitute teachers for their hourly back wages, and $13,542,186.74 for interest owed under HRS § 103-10 on the hourly and per diem back wages through May 18, 2015.

D. **<u>Kawashima</u> Circuit Court Proceedings**

In 2006, Diane Kawashima filed a class action complaint, alleging that the DOE had underpaid all PTTs because DOE's School Code Regulation 5203 linked the hourly pay rates of PTTs to the per diem pay rates for substitute teachers.[13]

---

[13]    On February 13, 2006, Kawashima filed a motion to intervene in the <u>Garner</u> case. <u>Garner I</u>, 122 Hawaii at 154, 223 P.3d at 219. On April 27, 2006, the circuit court denied the motion. <u>Id.</u>

Kawashima argued that because the DOE underpaid the substitute teachers, it followed that the DOE underpaid the PTTs as well.

Kawashima moved for class certification, and the circuit court granted the motion, appointing Kawashima as class representative for a certified class of:

> All persons employed by the State of Hawaiʻi
> Department of Education, who were paid according to
> the pay rates for Part-Time Teachers with or without a
> differential (excluding the class members in [the
> Garner and Kliternick cases]) at any time within the
> applicable statute of limitations.

The Kawashima case was stayed pending resolution of the interlocutory appeal in the Garner case. After the ICA issued its decision in Garner I, the stay was lifted.[14] Kawashima Plaintiffs then filed a motion for summary judgment, arguing that: (1) the DOE's School Code Regulation 5203 expressly linked the hourly pay rate for PTTs to the most current per diem pay rate for substitute teachers, and because the State had underpaid the substitute teachers, the State had necessarily underpaid the PTTs; and (2) the DOE's and BOE's "litigation-driven" attempts to amend Regulation 5203 beginning in January 2005 were improper and ineffective.

At the hearing on the motion, the circuit court determined that Regulation 5203 has the "same force and effect as law," and is subject to HRS chapter 91. The court also found

---

[14]    The Honorable Edwin C. Nacino presided from this point forward.

that Regulation 5203 did not fall under the two exceptions of an HRS chapter 91 rule because it did not involve internal management or affect the private rights of the public. The court reasoned that Regulation 5203 should have the same force and effect as law because it "in all shape and form, refers to [HRS § ] 302A-624(e) with regards to how the part-time teachers should be paid." Accordingly, the circuit court granted Kawashima Plaintiffs' motion for summary judgment. Because the court determined that Regulation 5203 is an HRS chapter 91 rule, any amendments to Regulation 5203 would have had to be made in accordance with HRS chapter 91's rulemaking processes, which was not completed until 2012 when the DOE adopted HAR chapter 8-66. However, if the court had determined the Regulation 5203 was not a rule, the DOE could have amended Regulation 5203 at any time, and it would not have been subject to HRS chapter 91's restrictions.

Kawashima Plaintiffs filed a motion for interest under HRS § 103-10 on the hourly unpaid wages, arguing that the circuit court's ruling in Garner that awarded substitute teachers interest on their per diem back wages under HRS § 103-10 was persuasive. The circuit court denied the motion without prejudice. Kawashima Plaintiffs filed a renewed motion for interest, arguing that the circuit court's ruling in Garner that

18

the substitute teachers were entitled to interest on both their hourly and per diem back wages under HRS § 103-10 was persuasive. The circuit court denied Kawashima Plaintiffs' renewed motion. Kawashima Plaintiffs filed a second renewed motion for summary judgment for interest, and the State filed a cross-motion for partial summary judgment as to interest. At the hearing on the motions, the circuit court determined that HRS § 103-10 did not apply to Kawashima Plaintiffs, and that the purpose and intent of HRS § 103-10 "is to address goods and services being provided by independent contractors, small business people, [and] maybe persons in general [that are] not even considered a contractor but [are] providing a service or goods to the State." Thus, the circuit court granted the State's motion and denied Kawashima Plaintiffs' second renewed motion, ruling that as a matter of law, Kawashima Plaintiffs were not entitled to interest on their hourly back wages under HRS § 103-10.

In 2015, Kawashima Plaintiffs moved for summary judgment to establish the amount of hourly back wages Plaintiffs were owed, and the interest thereon under HRS § 103-10 had they been entitled to it. The circuit court granted Kawashima Plaintiffs' motion, and on May 18, 2015, entered final judgment, establishing that Kawashima Plaintiffs were entitled to damages in the amount of $24,026,329.52 for their hourly back wages for

19

the period from February 20, 2004 through June 12, 2012. The circuit court also determined that had Plaintiffs been entitled to interest on their hourly unpaid wages under HRS § 103-10, they would have been entitled to $9,450,085.40 through May 6, 2015.

## E.   **Garner Appeal**

The State argues on appeal that the circuit court erred in:  (1) determining that the substitute teachers' hourly back wages were properly within the scope of Plaintiffs' claims, (2) determining that Regulation 5203 is an HRS chapter 91 rule, (3) granting summary judgment in favor of the substitute teachers on their hourly back wages contract claim, and (4) determining that the substitute teachers were entitled to interest on their hourly and per diem back wages under HRS § 103-10.

First, the State argues that the Garner Plaintiffs' claims did not include their hourly back wages, and that the trial court ignored prior rulings and the ICA's decision in Garner I when adding these claims.  Second, the State argues that Regulation 5203 is not an HRS chapter 91 rule because it was not adopted pursuant to rulemaking procedures, and even if it was, the State employees' wages are a matter of internal concern and should not be determined by rule.  Third, the State argues that the substitute teachers were paid the amount they contracted for, and that they do not have a valid contract claim for the alleged

20

additional wages owed.  Fourth, the State argues that Garner Plaintiffs are not entitled interest under HRS § 103-10 because the ICA already ruled on that issue in Garner I and prejudgment interest is not allowed.

In response, Garner Plaintiffs first argue that the class members who worked for both per diem and hourly wages are entitled to recover all their back wages because the class membership included teachers in all of their roles, the circuit court did not limit the scope of damages, and the State was given fair notice that hourly wages, as well as per diem wages, were in dispute.  Second, Garner Plaintiffs argue that they are entitled to wages mandated by Regulation 5203 because the State did not lawfully sever the link between Regulation 5203 and HRS § 302A-624 until June 2012 when it followed HRS chapter 91 rulemaking procedures.  Third, Garner Plaintiffs argue that with respect to their contracts, the State cannot ignore the law and must pay its employees lawfully prescribed rates of pay.  Fourth, Garner Plaintiffs argue that the circuit court had not previously addressed the issue of interest under HRS § 103-10, and that HRS § 103-10 is a "specific, targeted 'pay-mandating' immunity-waiving statute" that "creates a separate, enforceable waiver."

**F.  Kawashima Appeal**

In Kawashima, the State raises similar contentions as

21

in the Garner appeal.  In response, Kawashima Plaintiffs argue that the State cannot enter into or enforce contracts that are contrary to law, and that this issue was resolved in Garner I. Kawashima Plaintiffs also argue that the BOE had sole authority over the PTTs' pay rates, and that it did not act in accordance with HRS chapter 91, HRS chapter 89C, and HRS § 302A-1112,[15] until June 2012 at the earliest.

On cross-appeal, Kawashima Plaintiffs raise one issue: whether the circuit court erred in denying the PTTs interest on their unpaid hourly wages under HRS § 103-10.  Kawashima Plaintiffs argue that the State has no immunity against an award of interest under HRS § 103-10 because it is an "immunity-waiving, money-mandating statute," and that it applies broadly to "persons" and "contractors."  In response, the State argues that HRS § 103-10 is not applicable here because it applies only to contractors with claims covered by the Procurement Code.

G.   Transfer Applications

Kawashima and Garner Plaintiffs filed applications for transfer to this court, and we granted transfer in both cases.

---

[15]    HRS § 302A-1112 (1996) (Rules) provides:

Subject to chapter 91, the board may adopt rules for the government of all teachers, educational officers, other personnel, and pupils, and for carrying out the transaction of its business.

22

The cases were subsequently consolidated.

### III.  Standards of Review

**A.   Summary Judgment**

The appellate court reviews "the circuit court's grant or denial of summary judgment de novo."  Querubin v. Thronas, 107 Hawaiʻi 48, 56, 109 P.3d 689, 697 (2005) (quoting Durette v. Aloha Plastic Recycling, Inc., 105 Hawaiʻi 490, 501, 100 P.3d 60, 71 (2004)).  Accordingly,

> [o]n appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to a judgment as a matter of law.  In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.

Iddings v. Mee-Lee, 82 Hawaiʻi 1, 5, 919 P.2d 263, 267 (1996); see also Hawaiʻi Rules of Civil Procedure (HRCP) Rule 56(c) (2000).[16]

---

[16]  HRCP Rule 56(c) provides, in relevant part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

## B.    Statutory Interpretation

"Statutory interpretation is a question of law reviewable de novo."  First Ins. Co. of Hawaii v. A&B Props., 126 Hawaiʻi 406, 414, 271 P.3d 1165, 1173 (2012) (quoting State v. Wheeler, 121 Hawaiʻi 383, 390, 219 P.3d 1170, 1177 (2009) (internal quotation marks omitted)).

Our construction of statutes is guided by the following rules:

> First the fundamental starting point for statutory-interpretation is the language of the statute itself.  Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.  Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

Id. (quotations and citations omitted).

> In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning."  Moreover, the courts may resort to extrinsic aids in determining legislative intent.  One avenue is the use of legislative history as an interpretive tool.

Silva v. City & Cnty. of Honolulu, 115 Hawaiʻi 1, 6-7, 165 P.3d 247, 252-53 (2007) (citations omitted) (quoting Hawaii Home Infusion Assocs. v. Befitel, 114 Hawaiʻi 87, 91, 157 P.3d 526, 530 (2007)).

## IV.  Discussion

The issues presented on appeal include whether the circuit court erred in:  (1) finding that the Garner Plaintiffs' claims for hourly back wages were properly within the scope of the case; (2) finding that Regulation 5203 was an HRS chapter 91 rule; (3) granting Plaintiffs summary judgment on their hourly back wages contract claims; (4) either granting interest to the substitute teachers in Garner on their hourly and per diem back wages, or denying interest to the PTTs in Kawashima on their hourly back wages.

For the following reasons, we conclude that Regulation 5203 is not an HRS chapter 91 rule, that it does not have the force and effect of law, and that it was not incorporated into Plaintiffs' contracts.  Thus, Plaintiffs are not entitled to hourly back wages, and the circuit court erred in granting Plaintiffs summary judgment on their hourly back wages contract claims.  In addition, we conclude that HRS § 103-10 is not applicable here.  Therefore, Plaintiffs are not entitled to interest on their hourly and per diem back wages.  Because we decide this case on these grounds, we need not reach the issue of whether the substitute teachers' hourly wages were properly part of the Garner case.

25

## A.    The Circuit Court Erred in Finding That Regulation 5203 Is an HRS Chapter 91 Rule

The first issue that we must address is whether Regulation 5203 is a rule under HRS chapter 91.  If a regulation or procedure is determined to be a rule under HRS chapter 91, the state agency with the proper authority must follow the rulemaking procedures under HRS § 91-3 (2012) in order to adopt, amend or repeal the rule.  Thus, if Regulation 5203 is in fact a rule, then the DOE did not properly amend Regulation 5203 until 2012 when it adopted HAR chapter 8-66 in accordance with HRS chapter 91 processes, and the State would be liable for the PTTs' hourly back wages.  However, if we determine Regulation 5203 is not a rule, then Regulation 5203 would be an internal policy that the DOE may amend at any time, and the State would not be liable for any hourly back wages.

We conclude that Regulation 5203 is not a rule.  HRS § 302A-1112 (1996) provides broad authority for the BOE to adopt rules subject to HRS chapter 91:

> Subject to chapter 91 the [BOE] may adopt rules for the government of all teachers, educational officers, and other personnel, and for the carrying out the transaction of its business.

Under HRS § 91-1(4) (2012), a rule is defined as follows:

> "Rule" means each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy,

> or describes the organization, procedure, or practice requirements of any agency.  The term does not include regulations concerning only the internal management of an agency and not affecting private rights of or procedures available to the public, nor does the term include declaratory rulings issued pursuant to section 91-8, nor intra-agency memoranda.

Thus, the general definition of rule is a "statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency."  Green Party of Hawaii v. Nago, 138 Hawaiʻi 228, 237, 378 P.3d 944, 953 (2016).  In Green Party, we concluded that the Office of Election's procedure to determine the number of election ballots to be delivered to the precincts was a rule because it "meets the generality element of HRS § 91-1(4) as it is applied statewide for the ordering of ballots in every precinct," and would also "operate in the future."  Id. at 239-40, 378 P.3d at 955-56; see also Nuuanu Valley Ass'n v. City & Cty. of Honolulu, 119 Hawaiʻi 90, 99-100, 194 P.3d 531, 540-41 (2008) (determining that the Department of Planning and Permitting of the City and County of Honolulu's "policy of refusing to publicly disclose . . . engineering reports prior to their approval" was a rule because it "affect[ed] the procedures available to the public" in that the files were "public records and may be examined upon request") (internal brackets and quotation marks omitted) (citing HRS § 91-1(4))).  Here,

27

Regulation 5203 meets the generality requirement of HRS § 91-1(4) because it applies statewide for all part-time teachers employed by the DOE, and also operates in the future because it prescribes prospective compensation for part-time teachers.

Nevertheless, although Regulation 5203 meets the generality and future effect requirements of HRS § 91-1(4), it falls within an exception to the general definition of a rule. The exceptions to the general definition of rule include "regulations that concern only the internal management of an agency, and that do not affect private rights of or procedures available to the public." Green Party, 138 Hawaiʻi at 238, 378 P.3d at 954. When considering whether a regulation concerns internal management, we consider "to whom the regulations are directed. If the regulation is principally directed to its staff, then it is generally considered to be a matter of internal management." Id. (citations omitted). We stated that this approach is consistent with the legislative history of HRS § 91-1(4):

> It is intended by this definition of "rule" that regulations and policy prescribed and used by an agency principally directed to its staff and its operations are excluded from the definition. In this connection your Committee considers matters relating to the operation and management of state and county penal, correctional, welfare, educational, public health and mental health institutions, operation of the National Guard, the custodial management of the property of the state or county or of any agency primarily a matter of "internal management" as used in this definition.

28

Id. (quoting H. Stand. Comm. Report No. 8, in 1961 House Journal, at 656).

However, even if it is "determined that a regulation concerns only internal management of an agency, the exception will apply only if it is also determined that the regulation does not affect private rights or procedures available to the public." Id. at 238–39, 378 P.3d at 954–55 (stating that the exception was "intended to have a 'limited scope' because it only applies if it both relates to internal management of the agency and it does not affect private rights or public procedures").

This court has analyzed the applicability of the internal management exception several times. At issue in Green Party was whether the Office of Election's methodology and procedures in the 2012 election used to "(1) determine the number of election ballots to be delivered to the precincts, (2) request additional ballots when a precinct runs out of paper ballots, and (3) count the votes cast on a ballot for a precinct in which the voter is not entitled to vote," constituted rules. 138 Hawaiʻi at 230, 378 P.3d at 946. This court concluded that the Office of Election's methodology used to determine the number of election ballots to be delivered to the precincts was a "rule." Id. at 241, 378 P.3d at 957. We reasoned that the ballot order method "meets the generality element of HRS § 91-1(4) as it is applied

29

statewide for the ordering of ballots in every precinct," and also would "operate in the future."  Id. at 239-40, 378 P.3d at 955-56.  Regarding the exception, this court reasoned that, "because ballot shortages may result in the deprivation of the right to vote, the ballot order methodology does not qualify for the internal management exception to the definition of a 'rule.'"  Id. at 240, 378 P.3d at 956.

This court also concluded that the procedure for counting votes cast on a ballot for an incorrect precinct constituted a rule.  Id. at 243, 378 P.3d at 959.  With respect to the internal management exception and the private rights of the public, this court reasoned that:

> [e]ven assuming that the procedure only concerned internal management of the agency, the method used by the Office of Elections would have a direct impact on the right to vote, including the private right of voters to have their votes counted.  Such a policy would not only affect the private right to vote, but it could also impact the outcome of an election or require a new election.

Id.

In Aguiar v. Hawaii Housing Authority, 55 Haw. 478, 522 P.2d 1255 (1974), this court determined that the Hawaiʻi Housing Authority's (HHA) internal regulations, which set forth maximum income limits for continued occupancy by tenants in public housing and established a payment schedule, were rules.  Id. at 489-90, 522 P.2d at 1262-63.  This court stated that the HHA's

amendment to its internal regulations "altered fundamentally the rental structure in public housing-its immediate result was to change the amount of rent paid by nearly every public housing tenant." Id. at 489, 522 P.2d at 1262. This court further stated that the amendments "setting maximum income limits for continued occupancy . . . determined every tenant's eligibility to remain in public housing." Id. This court reasoned that these amendments plainly "'affected' in both a practical and a legal sense the 'private rights' not only of those tenants actually living in public housing but also those members of the public at large who were interested in becoming tenants." Id.; see also Aluli v. Lewin, 73 Haw. 56, 57, 59, 828 P.2d 802, 803-04 (1992) (finding that the State Department of Health's issuance of an "air pollution permit authorizing the construction and operation of [geothermal] wells" which would emit hydrogen sulfide was not in accordance with rulemaking, and that "[a]ir quality is an integral part of the quality of life and the public should have input in these matters"); Burk v. Sunn, 68 Haw. 80, 93, 705 P.2d 17, 27 (1985) (holding that the Department of Social Services and Housing's policy with respect to prorating benefits under a food stamp program was a rule because it had a "direct impact on the rights of Food Stamp recipients").

In contrast, this court has held that bylaws or

instructional procedures that do not affect "private rights of or procedures available to the public" are not rules.  See Rose v. Oba, 68 Haw. 422, 427, 717 P.2d 1029, 1032 (1986).  In Rose, a doctor contended that his privileges to practice medicine at the Hilo Hospital were "revoked pursuant to invalid procedures."  Id. at 424, 717 P.2d 1030.  The doctor argued that the "rules and regulations pursuant to which his privileges were revoked were not promulgated in accordance with the rule-making procedures . . . as enacted in [HRS] Chapter 91."  Id. at 423, 717 P.2d 1030.  This court held that the regulations were not rules under HRS chapter 91 and that the:

> provisions for corrective action in the Hilo Hospital Bylaws do not affect private rights of or procedures available to the public.  At best, they only indirectly affect the private rights of the public to the extent the public has an interest in qualifications of doctors practicing in public hospitals, and to the extent a patient's choice of hospitals is reduced when his doctor's privileges at a particular hospital are revoked.

Id. at 427, 717 P.2d at 1032.

In Doe v. Chang, 58 Haw. 94, 564 P.2d 1271 (1977), this court considered whether a manual of instructions for Department of Social Services and Housing personnel concerning welfare fraud investigations was subject to HRS Chapter 91 rulemaking requirements.  Id. at 95, 564 P.2d at 1272-73.  This court held that the manual of instructions concerned "only its internal management" and did not "affect[] private rights of or procedures

32

available to the public." Id. at 96, 564 P.2d at 1273. This court reasoned:

> The only persons purporting to be instructed or ordered thereby are the personnel of the department. The manual does not define the circumstances under which welfare recipients, or others not members of the department personnel, shall be granted of [sic] denied benefits. It does not command the public to do anything, prohibit the public from doing anything or declare the rights of the public in any respect. It does not make any procedures available to the public. We find it difficult to hypothesize a stronger example of the internal regulation contemplated by HRS [§] 91-1(4).

Id.

Additionally, in In re Doe, 9 Haw. App. 406, 844 P.2d 679 (1992), the ICA considered whether the field sobriety testing procedures established by the Hawaiʻi County Police Department [HCPD] were a rule. Id. at 412, 844 P.2d at 682-83. The ICA reasoned that, like Chang, the procedures were:

> instructional in nature directed only to HCPD police officers. The procedures instructed the officers how to administer field sobriety tests to drivers reasonably believed to have been [driving under the influence], after they were properly stopped and ordered out of their cars. Also, although field sobriety tests intrude on drivers' rights . . . HCPD's field sobriety testing procedures are aimed at assuring the proper and correct methods of administering the tests to drivers.

Id. at 412, 844 P.2d at 682; see also Ah Ho v. Cobb, 62 Haw. 546, 552, 617 P.2d 1208, 1212 (1980) (finding that an agreement to rent excess space in a water transportation system was not a rule because "it concerns only the internal management of the [State Board of Land and Natural Resources] and does not affect the

33

private rights of or procedures available to the public"); <u>Crosby v. State Dep't of Budget & Fin.</u>, 76 Hawaiʻi 332, 345, 876 P.2d 1300, 1313 (1994) (affirming the circuit court's conclusion that a guideline by the State of Hawaiʻi Department of Accounting and General Services (DAGS) to the other departments in the State as to how DAGS interprets a statute was not a rule, reasoning that the guideline was "sent only to other state agencies and does not command or prohibit any action by any member of the public or any public employee"); <u>State v. Claunch</u>, 111 Hawaiʻi 59, 67, 137 P.3d 373, 381 (App. 2006) (finding that the "police department's regulation establishing and implementing an intoxication control roadblock program concerned only internal management of the department and was therefore not required to be promulgated pursuant to HRS Chapter 91"); <u>State v. Tengan</u>, 67 Haw. 451, 462, 691 P.2d 365, 373 (1984) (finding that the Director of Transportation's "approval of the use of the Intoxilyzer" was not rule making because the Director set "no policy and exercised no discretion with respect to the use of testing instruments; he merely coordinated State and federal efforts to maintain accuracy in chemical testing for blood alcohol"); <u>Pilaa 400, LLC v. Bd. of Land & Nat. Res.</u>, 132 Hawaiʻi 247, 265, 320 P.3d 912, 930 (2014) (finding that there is "no statutory requirement to enact rules regarding the valuation of damage to reef or valuable marine

34

resources").

Here, the instant case is akin to Rose, Chang, and In re Doe, which involved regulations that focused on internal management of an agency and did not affect the private rights of members of the public. Regulation 5203, like the regulations and policies in those aforementioned cases, falls squarely within the exception. Regulation 5203 affects only the DOE's internal management of its part-time teachers' hourly pay rate. Moreover, Regulation 5203 does not command members of the public to do anything or prohibit them from doing anything, nor does it declare the rights of members of the public or affect a procedure available to members of the public. Rather, Regulation 5203 at best only indirectly affects private rights of members of the public to the extent that the public has an interest in knowing how teachers' salaries are determined. This interest, however, is not sufficient to remove Regulation 5203 from the exception here.

The instant case is distinguishable from Green Party and Aguiar. In those cases, the regulations affected the private rights of members of the public and implemented law or policy, and thus were found to be rules. For example, in Green Party, the voting policies had a direct impact on the private right to vote and the general public's right to have their vote counted in

35

an election.  Green Party, 138 Hawaiʻi at 243, 378 P.3d at 959.

Additionally, in Aguiar, the HHA's regulations fundamentally

altered the rental structure in public housing, which immediately

changed the amount of rent for almost all public housing tenants

and affected every tenant's eligibility to remain in public

housing.  Aguiar, 55 Haw. at 489, 522 P.2d at 1262.  Here,

Regulation 5203 does not affect any private rights of the public

or any procedures available to the public, and does not prescribe

or implement law or policy.  Instead, Regulation 5203 affects

only the internal management of a DOE part-time teachers' pay

rate.

          In sum, Regulation 5203 is not a rule under HRS chapter

91, and thus was not required to be amended under HRS chapter

91's rulemaking procedures.  Therefore, the circuit court erred

in finding that Regulation 5203 was a rule under HRS chapter 91.

**B.    The Circuit Court Erred in Granting Summary Judgment in
      Favor of Plaintiffs for Their Hourly Back Wages Contract
      Claims**

          The State argues that because Regulation 5203 is not a

rule, the Superintendent and the Board properly changed

Regulation 5203, and the State is not liable for any alleged

amounts owed after the change.  The State also argues that

Regulation 5203 does not have the "force and effect of law and

cannot be incorporated into the contract or substituted for the

actual agreement of the parties." Garner and Kawashima Plaintiffs argue that the State cannot enter into or enforce contracts that are contrary to law, that it must pay its employees lawfully prescribed rates of pay, and that this issue was resolved in Garner I.

In Garner I, the ICA found that the substitute teachers were entitled to their per diem back wages because as part of the parties' agreement, the teachers' rate of pay was "subject to applicable State laws," and the parties "could not contract to violate a law determining the rate of pay." Garner I, 122 Hawaiʻi at 170, 223 P.3d at 235 (citations omitted). If we accept arguendo Garner I's threshold premise as true--that state law is incorporated into contracts--and if we determine that Regulation 5203 has the force and effect of law, then Regulation 5203 would be incorporated into the part-time teachers' contracts, and the State would be obligated to compensate the PTTs for hourly back wages. Here, the part-time teachers' argument is one step removed from the premise of Garner I because the PTTs' hourly pay rate is based on Regulation 5203, which links their compensation to the substitute teachers' pay rate prescribed by state law. In contrast, in Garner I, the substitute teachers' pay rate is directly prescribed by statute under HRS § 302A-624(e).

37

We conclude that Regulation 5203 does not have the force and effect of law, and that it is merely an internal policy that may be amended at any time.  Thus, Regulation 5203 is not incorporated into the part-time teachers' contracts, Plaintiffs are not entitled to hourly back wages, and the circuit court erred in granting summary judgment in favor of Plaintiffs for their hourly back wages contract claims.

HRS § 89C-1 (Supp. 2000), grants "appropriate authorities the necessary flexibility" to "adjust the wages, hours, benefits, and other terms and conditions of employment for their respective excluded public officers and employees."  HRS § 89C-1.5 (Supp. 2000) defines "appropriate authority" to include the BOE.  Further, HRS § 89C-4 (Supp. 2000) sets forth guidelines for the BOE to adjust compensation for excluded employees exempt from civil service:  "Each appropriate authority shall determine the adjustments that are relevant for their respective excluded employees who are exempt from civil service in consideration of the compensation and benefit packages provided for other employees in comparable agencies."[17]  Thus, HRS chapter 89C

---

[17]     At oral argument before this court, Plaintiffs argued that the State stipulated to a violation of HRS chapter 89C in the Kliternick stipulated order and amended judgment resolving all claims.  Plaintiffs argued that their second claim for relief in Kliternick was a violation of HRS chapter 89C, and because the State stipulated on a "free-standing basis for all the damages," this was a stipulation to a violation of HRS chapter 89C. However, the State did not explicitly stipulate to a violation of HRS chapter
                                                        (continued...)

clearly provides statutory authority for the BOE to adjust the wages of excluded employees, such as the part-time teachers here, in order to reflect the compensation rates of other comparable agencies.  However, while HRS chapter 89C provides the BOE authority and flexibility to adjust and amend the PTTs' pay rate, it does not confer the force and effect of law onto the School Code Regulations.

Additionally, HRS § 302A-1112 provides broad authority for the BOE to adopt rules subject to HRS chapter 91 for the "government of all teachers" and for the "carrying out of the transaction of its business."  Similar to HRS chapter 89C, while HRS § 302A-1112 provides the authority for the BOE authority to adopt HRS chapter 91 rules, it does not establish a process separate from HRS chapter 91 that would give Regulation 5203 the force and effect of law.

Further, HAR chapter 8-3 (2012) (Rules Applicable to Rulemaking Proceedings) does not provide authority to support the contention that Regulation 5203 has the force and effect of law. HAR chapter 8-3 applies to HRS chapter 91 rules and sets forth similar procedures to HRS chapter 91 that the BOE must follow

---

[17](...continued)
89C in either the Kliternick stipulated order or amended judgment.  Moreover, even if the State stipulated to a violation of HRS chapter 89C, HRS chapter 89C does not support Plaintiffs' contention that Regulation 5203 has the force and effect of law.

when adopting and amending HRS chapter 91 rules. Thus, HAR chapter 8-3 does not set forth a separate and distinct rulemaking process apart from HRS chapter 91, but instead, aligns the BOE's procedures with HRS chapter 91.

In conclusion, Regulation 5203 does not have the force and effect of law. Rather, Regulation 5203 is an internal policy within the School Code that may be amended at any time. While this court does not condone underpaying DOE teachers in violation of DOE policy, here, the applicable law does not provide a basis for the teachers' entitlement to hourly back wages. Thus, Regulation 5203 was not incorporated into the PTTs' contracts, and the circuit court erred in granting summary judgment in favor of Plaintiffs for their hourly back wages contract claims.

## C. Plaintiffs Are Not Entitled to Interest Under HRS § 103-10

The State argues that the ICA has already ruled in Garner I that the teachers are not entitled to prejudgment interest, and that Plaintiffs cannot "ignore the law of the case" and "try again on another theory" and a "different statute on remand." The State also argues that because Plaintiffs prevailed only on the theory that there was an express contract between the teachers and the DOE, the only waiver of sovereign immunity as to that claim is under HRS chapter 661, and that the teachers are attempting to circumvent HRS § 661-8 by referring to HRS § 103-

10.  The State argues that HRS § 661-8 provides that no pre-judgment interest is allowed except in certain instances, which are not present here, and that any doubt must be resolved in favor of the State.  Further, the State argues that HRS § 103-10 does not apply because it should be applied only to contractors in "complex, high value claims" covered by the Procurement Code.

Kawashima Plaintiffs argue that HRS § 661-8 does not preclude the right to interest because HRS § 103-10 is an "immunity-waiving, money-mandating statute" that confers a right to interest which "cannot be nullified because litigation ensues after an agency fails to pay."  Kawashima Plaintiffs also argue that HRS § 103-10 applies broadly to anyone who provides services to the State under a contract, and that the complexity of the claim does not have a role in the application of the statute.

The Garner circuit court found that the substitute teachers were entitled to interest on their per diem and hourly back wages under HRS § 103-10, reasoning that the contract between the parties incorporated applicable state law, including HRS § 103-10, and thus HRS § 103-10 "constitutes a contract expressly stipulating for the payment of interest as required under [HRS] 661-8."

In contrast, the Kawashima circuit court found that the PTTs were not entitled to interest on their hourly back wages

41

under HRS § 103-10, agreeing with the State's contentions that sovereign immunity under HRS § 661-8 applied, and that immunity is waived only if the contract "calls for prejudgment interest." The Kawashima circuit court further determined that HRS § 103-10 did not apply here, and that the purpose and intent of HRS § 103-10 was to "address goods and services being provided by independent contractors, small business people," and "maybe persons in general" that are "not considered a contractor but [are] providing a service or goods to the State."

We begin our analysis by addressing the threshold question of whether the ICA's holding in Garner I precludes the award of interest on another theory here. We conclude that it does not. The State's reliance on Taylor-Rice v. State, 105 Hawaiʻi 104, 94 P.3d 659 (2004) to support its contention the ICA has already ruled that the teachers are not entitled to interest is misplaced. In the underlying case, defendant Leigh and defendant-appellee, State of Hawaiʻi, were found to be "joint tortfeasors in an action arising from a single-car accident." Id. at 106, 94 P.3d at 661. In its judgment, the circuit court found that "(1) the defendants were jointly and severally liable for damages, costs, and post-judgment interest and (2) Leigh was solely liable for pre-judgment interest." Id. This court determined that the plaintiffs did not "argue that the circuit

42

court erred in failing to hold the State liable for pre-judgment interest." Id. Therefore, this court determined that "because the plaintiffs did not challenge the circuit court's failure to hold the State liable for pre-judgment interest, the plaintiffs 'must be held to acquiesce in' the judgment and are precluded from now challenging it." Id.

Here, the issue of whether the teachers are entitled to interest under HRS § 103-10 has not been foreclosed by the ICA's Garner I decision, which was an interlocutory appeal. While the ICA ruled in Garner I that the substitute teachers were not entitled to prejudgment interest under HRS §§ 661-8 and 478-2, it did not make a determination regarding whether the substitute teachers were entitled to interest on their back wages under HRS § 103-10. Contrary to the argument of the State, that ruling is not the "law of the case" with regard to a completely distinct theory that was not raised or addressed in that interlocutory appeal.

Turning to the merits, HRS chapter 661, which is entitled "Actions By And Against the State," provides:

> No interest shall be allowed on any claim up to the time of the rendition of judgment thereon by the court, unless upon a contract expressly stipulating for the payment of interest, or upon a refund of a payment into the "litigated claims fund" as provided by law.

HRS § 661-8.

Here, the record does not support the conclusion that the teachers' contracts expressly stipulated for the payment of interest. The teachers' contracts at issue, which consist of an "Application for Part-Time Temporary Teacher Position (Form 150)" and a "Payroll Understanding" form, do not expressly state that the teachers will be entitled to the payment of interest.

However, Kawashima Plaintiffs further argue that HRS § 661-8 does not preclude an award of interest because HRS § 103-10 is an "immunity-waiving, money-mandating statute." This court has stated that statutory waivers of sovereign immunity will be strictly construed and that "a waiver of sovereign immunity must be unequivocally expressed in statutory text, and legislative history cannot supply a waiver that does not appear clearly in any statutory text," nor can sovereign immunity be waived based on policy arguments. Taylor-Rice, 105 Hawaiʻi at 110, 112, 94 P.3d at 663, 667. Therefore, any ambiguity as to whether HRS § 103-10 expressly waives sovereign immunity regarding payment of interest should be construed in favor of the State.

As set forth below, the plain language of HRS § 103-10 is ambiguous as to whether it applies in the instant case. Accordingly, we refer to the Findings and Purpose section of Act 292 (which was codified as HRS § 103-10), and HRS § 103-10's legislative history, in order to resolve that ambiguity, and

44

conclude that HRS § 103-10 does not apply here.

HRS § 103-10 (Payment for goods and services) provides in pertinent part:

> (a) Any person who renders a proper statement for goods delivered or services performed, pursuant to contract, to any agency of the State or any county, shall be paid no later than thirty calendar days following receipt of the statement or satisfactory delivery of the goods or performance of the services. In the event circumstances prevent the paying agency from complying with this section, the person shall be entitled to interest from the paying agency . . . .
>
> (b) This section shall not apply in those cases where delay in payment is due to:
>
>> (1) A bona fide dispute between the State or any county and the contractor concerning the services or goods contracted for;
>> (2) A labor dispute;
>> (3) A power or mechanical failure;
>> (4) Fire;
>> (5) Acts of God; or
>> (6) Any similar circumstances beyond the control of the State or any county.

Plaintiffs argue that HRS § 103-10 broadly applies to "any person," and that the term "contractor" includes the teachers because the plain language definition of "contractor" is "anyone who provides services under a contract." Further, they suggest that the definition of "contractor" in HRS § 103D-104 (a "[c]ontractor means any person having a contract with a government body"), supports their argument that HRS § 103-10 applies to the teachers in the instant case.

However, other provisions in the relevant statutes suggest that HRS § 103-10 does not encompass claims for wages brought by State employees, such as those at issue here.

45

Relevant to our interpretation of HRS § 103-10, HRS §103-1.5
(1993) (Definitions) provides that:  "The definitions of chapter
103D [(Hawaii Public Procurement Code)] shall apply to [HRS]
chapter [103] unless the context clearly requires otherwise."
Under HRS § 103D-104 (1993) (Definitions), "contract" means "all
types of agreements, regardless of what they may be called, for
the procurement or disposal of goods or services, or for
construction."  Also pursuant to HRS § 103D-104, "procurement"
means:

> buying, purchasing, renting, leasing, or otherwise
> acquiring any good, service, or construction.  The
> term also includes all functions that pertain to the
> obtaining of any good, service, or construction,
> including description of requirements, selection and
> solicitation of sources, preparation and award of
> contracts, and all phases of contract administration.

Thus, the plain language of HRS § 103-10 and the
applicable definitions under HRS § 103D-104 indicate that the
type of contract referred to in HRS § 103-10 includes "agreements
. . . for the procurement or disposal of goods or services, or
for construction."  Applying those provisions here, it appears
that the teachers' contracts are not agreements for the
procurement of goods or services as provided for in HRS § 103D-
104 and the Procurement Code.  The teachers are not selling goods
or services, but rather are being compensated as employees in
accordance with their contracts with the State.  Under this
interpretation, the teachers' contracts would not be the type of

46

contracts governed by HRS § 103-10.

Due to the ambiguity in the plain language of HRS § 103-10 and these related provisions, we turn to the Findings and Purpose section of Act 292, which was later codified as HRS § 103-10, for guidance.  See Poe v. Haw. Labor Relations Bd., 97 Hawaiʻi 528, 540, 40 P.3d 930, 942 (2002) (determining that statements of findings and policy may be used to clarify ambiguities as a "guide for determining legislative intent and purpose").  The Findings and Purpose section supports the conclusion that HRS § 103-10 does not apply to the teachers in the instant case.  The section reads as follows:

> SECTION 1. Findings and Purpose.  The legislature finds that a substantial number of contractors selling goods and services to the state and county governments must frequently wait 90 to 120 or more days to receive payment.  The purpose of this Act is to require prompt payment on government contracts.

1967 Haw. Sess. Laws Act 292, § 1 at 464.

Thus, the Findings and Purpose section of Act 292 indicates that the legislature intended HRS § 103-10 to be applied to "contractors selling goods and services." (Emphasis added.)  Plaintiffs are not "contractors" who are selling "goods and services," but rather are employees of the State.  If the legislature intended HRS § 103-10 to apply to any government employee, such as the teachers in the instant case, the legislature could have explicitly stated that in the plain

47

language of HRS § 103-10.  However, the legislature did not provide any statutory language that explicitly makes HRS § 103-10 applicable to the type of contracts in this case.

Further, the legislative history also supports the interpretation that HRS § 103-10 was not intended to be applied to the teachers' contracts at issue in the instant case.  With respect to HRS § 103-10, the Senate's Federal-State-County Relations and Government Efficiency Committee stated that:

> The purpose of this bill is to require reasonably prompt payments by the state to contractors for goods delivered or services rendered and to require the payment of interest at the rate of one-half of one percent per month on balances unpaid within a prescribed period.
>
> Under present conditions, many [businesspersons] providing goods and services to State agencies have had to wait between 90 to 120 days after presentation of invoices before receiving payment.

S. Stand. Comm. Rep. No. 663, in 1967 Senate Journal, at 1152.

The teachers here are not "businesspersons" who provide goods and services to State agencies.  Instead, the teachers are government employees who are working pursuant to employment contracts with the State.

In sum, both the Findings and Purpose section in Act 292 and the relevant legislative history support the conclusion that HRS § 103-10 does not apply to Plaintiffs' claims here. Moreover, as noted above, any ambiguity concerning a waiver of sovereign immunity should be construed in favor of the State.

Accordingly, Plaintiffs are not entitled to interest on their back wages.

### V.  Conclusion

In sum, the circuit court in both <u>Kawashima</u> and <u>Garner</u> erred in:  (1) determining that Regulation 5203 is an HRS chapter 91 rule, and (2) granting summary judgment in favor of Plaintiffs for their hourly back wages contract claims.  In <u>Garner</u>, the circuit court further erred by finding that Plaintiffs were entitled to interest on their per diem and hourly back wages under HRS § 103-10.

For the foregoing reasons, the circuit court's May 19, 2015 judgment in <u>Garner</u> is reversed and remanded for entry of judgment in favor of the State.  Additionally, circuit court's May 18, 2015 judgment in <u>Kawashima</u> is affirmed in part to the extent that the circuit court determined that Plaintiffs are not entitled to interest under HRS § 103-10, and reversed on all other remaining grounds and remanded for entry of judgment in favor of the State.

| | |
|---|---|
| William J. Wynhoff and David D. Day for appellants | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Paul Alston and Eric G. Ferrer for appellees | /s/ Michael D. Wilson |
| | /s/ Virginia L. Crandall |
| | /s/ Gary W. B. Chang |

